## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CUSHMAN & WAKEFIELD, INC., | Civil Action No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ILLINOIS NATIONAL INSURANCE COMPANY, ACE AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, and RLI INSURANCE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Cushman & Wakefield, Inc. ("C&W"), by and through its undersigned attorneys, and for its Complaint against Illinois National Insurance Company ("Illinois National"), ACE American Insurance Company ("ACE"), Liberty Mutual Insurance Company ("Liberty Mutual"), and RLI Insurance Company ("RLI") (collectively, "Defendants") alleges as follows:

## I.   INTRODUCTION

1.     This insurance coverage action seeks a declaration of coverage against C&W's insurers with respect to underlying matters brought against C&W which fall precisely within the claims-made coverage at issue.  It also seeks damages against two of those insurers, defendants Illinois National and ACE, who have made the conscious and wrongful decision to deter C&W's claims for coverage by making it as expensive and complex as possible for C&W to pursue those claims.

2.     C&W is the world's largest privately-held commercial real estate services firm, with more than 16,000 professionals operating from approximately 250 offices in 60 countries

1

and six continents.  C&W offers dynamic, well-researched real estate appraisal related services for a variety of property types.

3.      Between 2004 and 2007 Credit Suisse AG ("Credit Suisse") retained C&W to perform real estate appraisals for loans made to developers of large, master-planned residential communities ("MPCs").  Credit Suisse arranged and underwrote the loans, hedge funds and institutional lenders funded them, and C&W provided the appraisals, which used a "Total Net Value" ("TNV") appraisal conclusion.  Many of the loans went into default during the 2008-2010 economic crisis and substantial litigation and claims against, among others, C&W ensued (the "Underlying Claims," more specifically described in paragraphs 33 through 44 herein).

4.      The Underlying Claims involve the following:  (1) a January 3, 2010, lawsuit filed against C&W by homeowners in certain residential communities appraised by C&W, (2) an August 2010 claim against C&W by a hedge fund that became a lender in the loans alleging that it had suffered damage from C&W's appraisals (C&W spent substantial sums responding to this matter, but it did not ultimately result in a lawsuit against C&W), (3) a February 2012 lawsuit filed against C&W by a shareholder of the developer of one of the residential communities that C&W appraised, and (4) a January 2013 lawsuit filed against C&W by the developer of one of the residential communities that C&W appraised.

5.      For nearly five years, C&W has successfully defended against the Underlying Claims.  For example, it defeated class certification and won sanctions against plaintiffs' counsel in one action and won a motion to dismiss with prejudice in another.  Each of those victories redounded directly to the benefit of the defendant insurers, who would have been liable for any damages assessed against C&W in the Underlying Claims.

6.      Rather than reward C&W for its success and provide coverage in conformance with its insurance policies and other legal obligations, Illinois National instead engaged in a pattern of relying on a series of ever-evolving insupportable coverage defenses in order to seriously restrict, or avoid altogether, its duty to pay for the Underlying Claims.

7.      C&W provided timely notice to its insurers of each of the Underlying Claims beginning in 2010 with the filing of the first lawsuit.  Under the terms of the claims-made coverage the Defendants sold to C&W from 2009 to 2013, each of the Underlying Claims is covered under the policy year in which that Claim was first made.

8.      For two years, Illinois National accepted coverage and contributed to the costs of C&W's defense with respect to the Underlying Claims.

9.      Once it appeared to Illinois National that C&W's exposure to the Underlying Claims may be significant, Illinois National decided to seek to limit its exposure by raising new and inapplicable coverage defenses for the Underlying Claims and asserting that they all fell under the single 2009-10 policy year, and thus, that Illinois National's total exposure for the combined Underlying Claims was limited to that single year's coverage limits.

10.     When C&W challenged Illinois National's approach, Illinois National responded by undertaking a campaign of wrongful conduct designed to force C&W to accede to Illinois National, and to stop pursuing recovery under any other policy year.  As part of that campaign:

(a)      Illinois National asserted that it was entitled to treat all of the claims against C&W in any way connected to the TNV appraisals, including any potential future claims, as triggering only the 2009-10 Illinois National policy, rather than treating the individual claims as triggering separate policy years, thus limiting Illinois National's exposure for the Underlying Claims to a single set of policy limits;

(b)      Illinois National threatened that if C&W did not accept that position, Illinois National could refuse to renew C&W's coverage with Illinois National, and deny coverage to C&W altogether under all of its policies based upon newly asserted interpretations of its policy language and the applicable facts (not previously asserted during the prior three years since C&W tendered the first Underlying Claim), and thus significantly increase the costs to C&W in pursuing its claim for coverage;

(c)      When C&W refused to accede to that demand, in part because to do so would improperly exhaust the 2009-10 limits and thus prematurely "trigger" payments under the

excess policies above Illinois National in that year, Illinois National made good on its threat. It began what has become an endless game of "Whac-A-Mole," in which Illinois National raises an inapplicable coverage defense and forces C&W to spend money to respond and demonstrate its inapplicability, only to have Illinois National raise yet another such defense that C&W would then again spend additional funds to respond to and discredit;

(d)     To put further pressure on C&W, Illinois National also began to assert it had a right to recoup payments made with respect to the Underlying Claims – a right not supported by either the law or the language of Illinois National's policies; and

(e)     When C&W attempted to resolve these issues without resort to litigation by entering into an interim agreement with C&W and ACE in 2014 that called for Illinois National (and ACE) to continue payments towards C&W's defense while the parties negotiated the coverage claims, Illinois National effectively avoided its payment obligations under that interim agreement by falsely claiming that it had not received required documentation, which in many cases C&W had not only provided, but provided multiple times to Illinois National.

11.     Defendant ACE also has acted unreasonably with respect to the Underlying Claims. In particular, ACE delayed until late January 2014 taking any position regarding coverage for any of the Underlying Claims. This was despite the fact that on multiple occasions, including in September and October 2013, ACE informed C&W that it (1) disagreed with Illinois National's assertion that the Underlying Claims, brought by different plaintiffs, in different policy years, based on different work by C&W, all constitute a single series of related claims, thereby triggering only the 2009-10 policy year, and that ACE instead believed that the Claims triggered coverage in the policy year in which they first were made, and (2) immediately would provide this position in writing to C&W. Regardless of these express representations, and despite ACE's knowledge that Illinois National had demanded ACE's position on the issue because C&W was seeking to resolve its dispute with Illinois National, ACE repeatedly failed to do so in a timely manner, thereby prejudicing C&W's financial interests with respect to the Underlying Claims.

4

12.     ACE also acted unreasonably by promising first in April 2014 and then again in August and September 2014 in interim agreements with C&W and Illinois National to pay for a portion of C&W's ongoing defense expenditures in the Underlying Claims, but, regardless of these representations, failing to pay for any of C&W's defense, yet again to C&W's financial prejudice.

13.     The remaining insurer defendants sold C&W insurance policies above the Illinois National layer of coverage, and thus will be affected by the rejection of Illinois National's false claim that the Underlying Actions are allocable to a single policy year.  They are included as defendants in this action to permit a global resolution of the proper allocation of the Underlying Claims.

## II.     <u>THE PARTIES</u>

14.     Plaintiff is a corporation organized under the laws of New York, with its principal place of business in New York, New York.

15.     Upon information and belief, defendant Illinois National is a corporation organized under the laws of Illinois, with its principal place of business in Illinois.

16.     Upon information and belief, defendant ACE is a corporation organized under the laws of Pennsylvania, with its principal place of business in Pennsylvania.

17.     Upon information and belief, defendant Liberty Mutual is a corporation organized under the laws of Massachusetts, with its principal place of business in Massachusetts.

18.     Upon information and belief, defendant RLI is a corporation organized under the laws of Illinois, with its principal place of business in Illinois.

III.     **JURISDICTION AND VENUE**

19.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this Action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

IV.     **FACTUAL ALLEGATIONS**

A.     **The Illinois National Policies**

21.     In consideration of premiums fully paid to cover precisely the type of damages at issue here, Illinois National sold C&W the following insurance policies (collectively referred to herein as the "Illinois National Policies"):

(a)   Policy No. 01-911-84-71, which was in effect from May 31, 2009, to May 31, 2010, and provides $23 million of coverage, excess of $2 million (the "Illinois National 2009-10 Policy");

(b)   Policy No. 01-877-33-21, which was in effect from May 31, 2010, to May 31, 2011, and provides $23 million of coverage, excess of $2 million (the "Illinois National 2010-11 Policy");

(c)   Policy No. 01-880-59-08, which was in effect from May 31, 2011, to June 30, 2012, and provides $23 million of coverage, excess of $2 million (the "Illinois National 2011-12 Policy"); and

(d)   Policy No. 0230588092, which was in effect from June 30, 2012, to August 31, 2013, and provides $15 million of coverage, excess of $2 million (the "Illinois National 2012-13 Policy").

22.     The Illinois National Policies each cover actual or alleged acts, errors or omissions committed by C&W in connection with the professional services it renders for or on

behalf of its customers or clients, which include C&W's provision of real estate appraisals on behalf of its clients.

23.     Each of the Illinois National Policies follows form to an underlying Real Estate Services Professional Liability insurance policy sold by Nottingham Indemnity, Inc. ("Nottingham") covering the respective policy year (collectively, the "Nottingham Policies"), except as expressly stated otherwise.

24.     The Nottingham Policies provide under Section 1 that:

> [t]he Company will pay on behalf of the Insured all sums in excess of the Deductible which the Insured shall become legally obligated to pay as Damages and Claims Expenses for claims first made against the Insured during the Policy Period . . . as a result of a Wrongful Act of the Insured . . . .  The Wrongful Act must arise out of the rendering or failure to render Professional Services . . . .

*Id.* § 1.

25.     The Nottingham Policies also provide:

> [t]he Company has the sole right to appoint counsel and the right and duty to defend any Claim or Suit brought against the Insured seeking Damages on account of a Wrongful Act even if such Claim or Suit is groundless, false or fraudulent.

*Id.* § 2.

26.     The Nottingham Policies also include the following relevant definitions:

(a)   "Claim" is defined as "[a] written demand for money or services naming any Insured and alleging a Wrongful Act to which this policy applies."  *Id*. at Definitions ¶ 1.

(b)   "Claims Expenses" means "[a]ll expenses incurred by . . . [C&W] with [Nottingham's] consent in the investigation, adjustment,

negotiation, arbitration, defense . . . of any Suit or Claim for Damages." *Id.* ¶ 2.

(c) "Damages" means "[a]ny compensatory sum which an Insured is legally obligated to pay for any Claim, including (a) settlements reached through Alternative Dispute Resolution Procedures, (b) judgment and settlement with [Nottingham and C&W's] mutual written consent." *Id.* ¶ 3.

(d) "Professional Services" is defined as "[a]ll services rendered or to be rendered by the Insured for or on behalf of customers or clients." *Id.* ¶ 6.

(e) "Wrongful Act" is defined as "[a]ny actual or alleged act, error or omission committed in connection with the conduct of the Insured's Professional Services." *Id.* ¶ 9.

### B.   The ACE 2009-10 Policy

27.    In consideration of premiums fully paid to cover precisely the type of damages at issue here, ACE sold C&W the following insurance policy:  Policy No. XEO G23658495 002, which was in effect from May 31, 2009, to May 31, 2010, and provides $10 million of coverage, excess of $25 million (the "ACE 2009-10 Policy").

28.    The ACE 2009-10 Policy is immediately excess to the Illinois National 2009-10 Policy and follows form to the underlying Nottingham Policy, except as expressly stated otherwise.  The ACE 2009-10 Policy covers actual or alleged acts, errors or omissions committed by C&W in connection with the professional services it renders for or on behalf of its customers or clients, which include C&W's provision of real estate appraisals on behalf of its clients.

### C.     **The Liberty Mutual 2009-10 Policy**

29.     In consideration of premiums fully paid to cover precisely the type of damages at issue here, Liberty Mutual sold C&W the following insurance policy: Policy No. EO5N454658004, which was in effect from May 31, 2009, to May 31, 2010, and provides $7.5 million part of $15 million of coverage, excess of $35 million (the "Liberty Mutual 2009-10 Policy").

30.     The Liberty Mutual 2009-10 Policy is immediately excess to the ACE 2009-10 Policy and follows form to the underlying Nottingham Policy, except as expressly stated otherwise. The Liberty Mutual 2009-10 Policy covers actual or alleged acts, errors or omissions committed by C&W in connection with the professional services it renders for or on behalf of its customers or clients, which include C&W's provision of real estate appraisals on behalf of its clients.

### D.     **The RLI 2009-10 Policy**

31.     In consideration of premiums fully paid to cover precisely the type of damages at issue here, RLI sold C&W the following insurance policy: Policy No. EPG0009165, which was in effect from May 31, 2009, to May 31, 2010, and provides $7.5 million part of $15 million of coverage, excess of $35 million (the "RLI 2009-10 Policy").

32.     The RLI 2009-10 Policy is immediately excess to the ACE 2009-10 Policy and follows form to the underlying Nottingham Policy, except as expressly stated otherwise. The RLI 2009-10 Policy covers actual or alleged acts, errors or omissions committed by C&W in connection with the professional services it renders for or on behalf of its customers or clients, which include C&W's provision of real estate appraisals on behalf of its clients.

## V.    THE UNDERLYING CLAIMS AGAINST C&W

### A.    The *Gibson* Lawsuit

33.    On January 3, 2010, C&W was sued in a class action in the United States District Court for the District of Idaho, entitled *Gibson*, *et al. v. Credit Suisse AG*, *et. al.*, Case No. 1:10-cv-00001-EJL (the "*Gibson* Lawsuit").  The *Gibson* plaintiffs, homeowners of properties at various MPCs, allege that Credit Suisse developed a "loan to own" scheme, pursuant to which it allegedly induced developers of target MPCs to enter into loans through misleading representations meant to convince the developers that the appraised value of their operations was large enough to comfortably bear hundreds of millions of dollars in leveraged debt.  Those representations were allegedly based upon a TNV appraisal provided by C&W to Credit Suisse.  The plaintiffs further allege that the developers, who were supposedly duped into taking these loans from Credit Suisse, were unable to make their loan payments, which made it impossible for them to complete and maintain the high-end amenity improvements (*e.g.*, ski lifts and golf courses) that were allegedly the essence of each of the MPCs.  They further allege that the value of the MPCs – and thus of the homes and lots purchased by the plaintiffs – had substantially decreased as a result.  The *Gibson* plaintiffs sought damages for the alleged loss of homeowner value.

34.    C&W has thus far successfully defended against the *Gibson* matter.  To start, based upon a March 29, 2013, recommendation by the Magistrate Judge, on October 17, 2014, by order of the District Judge, C&W obtained sanctions against the *Gibson* plaintiffs for misrepresentations made by them regarding the evidentiary record.  A few months later, on September 24, 2013, C&W obtained an order from the court denying class certification.  It defeated the *Gibson* plaintiffs' motion for summary judgment, which was heard by the court in April 2014 and thereafter denied in September 2014.  It also defeated the *Gibson* plaintiffs' motion for approval to file a fourth amended complaint to add approximately ninety (90) new plaintiffs.  The court denied the motion for leave to amend in September 2014, without prejudice

10

to the *Gibson* plaintiffs refiling the motion with the inclusion of the proposed plaintiffs'
jurisdictional information. In response to the *Gibson* plaintiffs' renewed motion for leave to
amend, C&W may file a motion to dismiss based on the proposed plaintiffs' jurisdictional
information. On the chance that the court might deny the motion, counsel for the *Gibson*
plaintiffs has also filed a separate "placeholder" lawsuit in federal court in Boise, Idaho.

35.     C&W seeks coverage for the *Gibson* Lawsuit under the 2009-10 policy year,
which is the year in which the lawsuit first was filed.

### B.    The Highland Claim

36.     In August 2010, attorneys for Highland Capital ("Highland"), a hedge fund that
became a lender in loans arranged by Credit Suisse and made to the developers of twelve (12)
MPCs via contractual assignment, alleged that they suffered damage, in part, because the
appraisals prepared by C&W negligently and falsely obscured the real value of the MPCs, which
allegedly detrimentally affected Highland's ability to fully collect on the loans (the "Highland
Claim"). Soon after the Claim was made, the parties entered a tolling agreement with respect to
their dispute, which Highland terminated in the summer of 2013, creating immediate and
potentially massive exposure to C&W with respect to this Claim.

37.     C&W seeks coverage for the Highland Claim under the 2010-11 policy year,
which is the year in which the claim first was made.

### C.    The *Blixseth* Lawsuit

38.     In February 2012, C&W was sued in an action in the United States District Court
for the District of Colorado, entitled *Blixseth v. Cushman & Wakefield of Colorado, Inc., et al.*,
Case No. 1:12-cv-00393-PAB (the "*Blixseth* Lawsuit"). The plaintiff in that action, Timothy L.
Blixseth, is a shareholder of the developer of the Yellowstone Club resort. The complaint
alleges that Credit Suisse, C&W and others fraudulently "baited" Blixseth into causing the

developer of Yellowstone Club to accept, and Blixseth to take an individual distribution of proceeds from, a loan from Credit Suisse. Blixseth sought damages allegedly resulting from the inability of the developer to repay the loan.

39.    On September 30, 2013, the court granted C&W's motion to dismiss the *Blixseth* Lawsuit claims against it, without leave to amend. Blixseth filed a motion for reconsideration of, among other things, the court's dismissal of C&W with prejudice, which the court denied. Blixseth has yet to take the issue up on appeal.

40.    Blixseth had also sought to intervene in the *Gibson* Lawsuit, but the *Gibson* court denied Blixseth's effort, finding that intervention was not warranted because Blixseth's claims were too different from those alleged in the *Gibson* Lawsuit.

41.    C&W's successful defense redounds specifically and exclusively to the benefit of the defendant insurers, including Illinois National, who otherwise would have been obligated to indemnify C&W for any damage award entered against it in that lawsuit.

42.    C&W seeks coverage for the *Blixseth* Lawsuit under the 2011-12 policy year, which is the year in which it first was filed.

### D.    The *Rhodes* Lawsuit

43.    In January 2013, James Rhodes and others filed a third-party complaint against multiple Credit Suisse and C&W entities in an action pending in the United States Bankruptcy Court for the District of Nevada, entitled *Rhodes, et al. v. Credit Suisse AG, et al.*, Case No. 2:12-cv-01272-MMD (the "*Rhodes* Lawsuit"). The third-party plaintiffs received distributions made by the developer/borrower of the Rhodes Homes MPC from proceeds of a loan made by Credit Suisse to the developer. The third-party plaintiffs allege that C&W's use of the TNV appraisal conclusion misled the developer, as the loan recipient, into deciding to borrow "equity" and distribute funds from the development. The third-party plaintiffs sought unspecified

damages from C&W for negligent misrepresentation in the preparation of the appraisal, indemnity and/or equitable contribution.

44.     C&W seeks coverage for the *Rhodes* Lawsuit under the 2012-13 policy year, which is the year in which it first was filed.

## VI.     ILLINOIS NATIONAL'S UNREASONABLE AND INCONSISTENT CONDUCT WITH RESPECT TO THE UNDERLYING CLAIMS

### A.     Illinois National's Initial Response to the Underlying Claims

45.     C&W gave timely notice to the defendant insurers of each of the Underlying Claims.  As to each such Claim, Illinois National responded by agreeing to defend C&W, pursuant to a reservation of rights.  For example, Illinois National accepted the defense of the *Gibson* Lawsuit on or about February 9, 2010 and the Highland Claim in or about October 2010. Initially, until the Claims grew, Illinois National provided a defense to C&W subject to two minimal reservations which they later abandoned.

46.     Illinois National also, at least initially, and as it was legally obligated to do to increase the protections afforded to C&W under the Illinois National Policies, treated the Underlying Claims as involving multiple of Illinois National's policy years.  For example, during negotiations leading up to the inception of the Illinois National 2012-13 Policy, Illinois National sought to include a "TNV appraisal" policy exclusion in order to restrict coverage under its 2012-13 Policy for liabilities associated with appraisals that used the TNV methodology.  Illinois National subsequently withdrew its request that such an exclusion be included in the 2012-13 Policy.  Instead, just before the policy terms were to be finalized, Illinois National asked C&W to provide a list of all appraisals of which it currently was aware that involved the TNV methodology, so that any claims that might in any manner address those appraisals could be treated as made under the 2011-12 policy year.

47.     By letter dated June 28, 2012, C&W provided the requested list, and further stated that the list constituted its notice that if a claim as defined by the Illinois National Policies were

made in the future with respect to any of the listed appraisals, any such claim would be treated as triggering the Illinois National 2011-12 Policy, which was still in place as of the date of the letter (the "Laundry Listed Matters").

48.     On July 9, 2012, Illinois National responded to C&W's June 28, 2012, letter and confirmed its agreement to treat the Laundry Listed Matters as triggering the 2011-12 policy year.

## B.     Illinois National's Modified Approach Once its Exposure to the Underlying Claims Increased

49.     When additional lawsuits were filed against C&W and it became apparent to Illinois National that C&W's (and as a result, Illinois National's) exposure could be substantial, potentially impacting multiple policy limits spread over multiple years, Illinois National changed its response to the Underlying Claims against C&W and pursued an approach of citing to inconsistent coverage positions that appeared to be designed to accomplish only one goal – promoting Illinois National's own financial interests over those of C&W to C&W's clear financial detriment.

50.     Illinois National initiated this modified strategy when it sent an August 7, 2012, letter to C&W, which purported to respond to C&W's tender of the *Blixseth* Lawsuit (the third Underlying Claim noticed to Illinois National).  In that letter (sent over two years after Illinois National received notice of the *Gibson* Lawsuit and one year after Illinois National received notice of the Highland Claim), Illinois National for the first time cited to multiple claimed exclusions in its policies that Illinois National asserted might provide it with a basis in the future to deny coverage for the *Gibson* and *Blixseth* Lawsuits.

51.     Three months later, in a November 15, 2012, letter sent without any prompting other than an apparent internal concern about its own exposure for the claims against C&W, Illinois National revoked its July 9 letter (that accepted the Laundry Listed Matters under the 2011-12 policy year), and for the first time stated that it would treat any claims against C&W

that pertained in any manner to appraisals using the TNV methodology as a "single" claim triggering only the 2009-10 policy year.

52.     Despite claiming that it may treat all such claims as involving only one Illinois National policy year (and policy limit), five months later, in April 2013, Illinois National responded to C&W's notice of the *Rhodes* Lawsuit by accepting its duty to defend under Illinois National's 2012-13 Policy.

53.     Two months later, Illinois National learned that the Highland tolling agreement had been terminated, that C&W's exposure in that claim, separate and apart from any of the other Underlying Claims, could exceed each of Illinois National's policy limits in any given policy year, and that C&W sought coverage for that matter under the 2010-11 policy year (the year in which the Highland Claim first was made).  Illinois National responded by withdrawing its April 2013 agreement to treat the *Rhodes* Lawsuit as triggering the 2012-13 Policy and stated that instead it triggered the 2009-10 Policy.

54.     Illinois National also started making threats, including that if C&W did not accept Illinois National's position that all Underlying Claims triggered only the 2009-10 policy year, Illinois National would (1) consider not renewing C&W's coverage for the 2013-14 policy year, and (2) assert policy exclusions as a basis to deny coverage to C&W altogether.

55.     C&W did not accede, and Illinois National held true to its threat by commencing an immediate and endless game of policy exclusion "Whac-A-Mole."  Specifically, Illinois National raised on a seriatim basis multiple meritless claimed bases to exclude coverage altogether for the Underlying Claims, despite the fact that Illinois National had not previously asserted any such defenses in any other letter sent to C&W since Illinois National was given notice of the *Gibson* Lawsuit in or about January 2010.  As to each claimed defense, C&W expended substantial resources to demonstrate its inapplicability, only to have Illinois National raise yet another inapplicable coverage defense that C&W then spent additional funds to respond to and discredit.  This went on for months, with Illinois National raising numerous new and meritless coverage defenses and C&W discrediting each one in turn.

56.     Included within Illinois National's list of new and unsupported defenses was its assertion in the fall of 2013 that it might refuse to honor its contractual obligations with respect to the Highland Claim and the *Rhodes* Lawsuit unless C&W first agreed that Illinois National could recoup any amount it paid if ultimately it was determined the claims were not covered. C&W objected vigorously to Illinois National's position as being unsupported by the law and Illinois National's policies, but Illinois National did not back down.

57.     Instead, on January 24, 2014, Illinois National sent another letter again asserting new claimed coverage defenses and interpretations of the applicable facts and its policy language.  In this letter, which Illinois National claimed was a "supplemental" reservation of rights letter, it purported for the first time to reserve rights as to ***all*** the Underlying Claims. Illinois National:  (1) repeated verbatim the multiple inapplicable claimed coverage defenses listed in its August 7, 2012, letter and purported to expand their claimed application to each of the Underlying Claims, (2) ignored C&W's prior detailed explanations on July 30, August 13, August 16, August 22, and September 5, 2013, of why the listed defenses were not relevant to any of the Underlying Claims, and (3) asserted new, equally inapplicable defenses based upon misinterpretations of the cited "evidence."  C&W responded on January 31, 2014, and disputed each of Illinois National's claimed potential bases to reduce its obligations to pay for each of the Underlying Claims.  Regardless, Illinois National continues to advance its unsupported and conflicting positions as a basis to unreasonably restrict its duties to C&W with respect to the Underlying Claims.

## VII.   ACE'S UNREASONABLE RESPONSE TO THE UNDERLYING CLAIMS

58.     Despite having received timely notice of each of the Underlying Claims, ACE has yet to provide any position regarding coverage under the ACE Policy.

59.     Additionally, with respect to Illinois National and C&W's dispute regarding whether one or multiple policy years are triggered by the Underlying Claims, ACE made

multiple misrepresentations to C&W in an effort to stay on the sidelines and force C&W to fight what should be an intra-insurer dispute between ACE and Illinois National.

60.     In particular, after the Highland tolling agreement was terminated in the summer of 2013 and Illinois National entrenched itself in its position that the Underlying Claims trigger only the 2009-10 policy year, C&W sought ACE's assistance in resolving the matter by providing ACE's position on the issue.  ACE was informed that during the period in which Illinois National had changed its position on the question of whether the Underlying Claims all fall within a single policy period, Illinois National had repeatedly requested ACE's position on that issue.  It therefore was aware that providing C&W with its written rejection of the "single-year" allocation in a timely manner would have assisted C&W, and increased the likelihood that Illinois National would abandon that improper allocation of the Underlying Claims.  ACE orally responded in September 2013 by informing C&W that ACE disagreed with Illinois National's position and instead believed that the Underlying Claims trigger multiple policy years – the policy year in which each such claim first was made against C&W.

61.     ACE also represented on multiple occasions in September and October 2013 that within a certain number of days it would provide its written position that the Underlying Claims trigger multiple policy years, as opposed to only one.  However, despite its promises, on each occasion, ACE did not provide any written position.  Instead, it continued to promise that it would send a letter and it continued not to do so.

62.     Not until late January 2014 did ACE finally first send any written statement confirming its position that the Underlying Claims trigger multiple policy years.  ACE's written position, in part, led to the negotiation of the interim agreements described in paragraphs 64 through 67 below, in which ACE made promises to pay significant monies, which, as set forth in paragraph 67, it has failed to do.

63.     ACE's failure and refusal to timely address the issue forced C&W to spend substantial resources of its own that otherwise should have been spent by ACE to negotiate with

Illinois National, and otherwise prejudiced C&W's interests with respect to the Underlying Claims.

## VIII.    THE STANDSTILL AGREEMENT

64.     Despite Illinois National's and ACE's unreasonable responses to the Underlying Claims, C&W agreed to delay pursuing litigation while it attempted to work with the insurers to informally resolve their dispute.  In that regard, on April 14, 2014, C&W, Illinois National, and ACE entered into a Standstill Agreement ("Standstill Agreement").  In that Agreement, Illinois National and ACE both committed to paying C&W's defense expenses in the Underlying Claims, with Illinois National paying 50% and ACE paying the other 50%.  In exchange for this commitment by Illinois National and ACE, along with other commitments they each made, C&W agreed to not pursue coverage litigation until, at the earliest, August 30, 2014.  C&W's ability to enter into the Standstill Agreement was made possible by successes achieved by C&W in the Underlying Claims attributable to C&W's effective and aggressive defense of the matters.

65.     On August 26, 2014, to provide the parties with additional time to seek to amicably resolve their dispute, C&W, Illinois National, and ACE extended the Standstill Agreement, maintaining all of its terms, including that Illinois National and ACE would fund, on a 50/50 basis, C&W's defense of the Underlying Claims (the "Extended Standstill Agreement"). Pursuant to the Extended Standstill Agreement, C&W agreed to not commence coverage litigation until September 30, 2014.  On September 30, 2014, C&W, Illinois National, and ACE entered into a Second Extended Standstill Agreement, pursuant to which C&W agreed not to file suit until October 30, 2014.

66.     In exchange for C&W's agreement to forego an immediate coverage action, and as a direct inducement to C&W's willingness to enter into such an agreement, Illinois National and ACE specifically agreed to continue payments toward C&W's defense of the Underlying Actions.

67.     Despite those express promises that their payments to C&W would continue during the term of the Standstill Agreements, Illinois National and ACE have not made the payments they promised to C&W since the Standstill Agreements were executed.  As an excuse for evading those obligations, both insurers have ignored the detailed information already provided to them by C&W with respect to the Underlying Claims, and Illinois National has demanded further information and documents – much of it previously provided by C&W – and relied on its supposed "need" for that information as an excuse for withholding the promised payments.

## IX.     THE OTHER CLAIMS

68.     In addition to the Underlying Claims, there are numerous Other Claims made against C&W that have triggered the Illinois National Policies, but as to which Illinois National has unreasonably delayed the payment of defense costs or refused payment completely.

69.     The Other Claims consist of:  (a) Fiddler's Creek, a claim made in the 2009-10 policy year (the "2009-10 Other Claim"), (b) the Sofka claim made in the 2010-11 policy year (the "2010-11 Other Claim"), and (c) the Angino & Rovner, Barrons Family Trust, Behringer Harvard, Berish Berger, Citadel, Kornievsky, McCready, Orient Overseas, Studio Mix, Sunflower Square, and Universal Green Solutions claims made in the 2012-13 policy year (the "2012-13 Other Claims").

70.     C&W timely notified Illinois National of the Other Claims, for which it seeks coverage under the 2009-10, 2010-11, and 2012-13 policy years.

71.     C&W also timely provided Illinois National with reasonable documentation and information regarding defense costs, and, in fact, provided some of that information on multiple occasions, in response to repeated requests from Illinois National.

72.     Illinois National has unreasonably and without proper basis delayed payments on the 2009-10 Other Claim, based on its assertion that it has not received invoices and/or other documentation and information allegedly necessary to process certain payments.

73.     C&W has cooperated with Illinois National and provided documentation and information reasonably requested, including, in many cases, complying with Illinois National's request that it provide additional copies of materials previously given to the insurer.  Illinois National has ignored the information in its possession, instead requiring C&W to essentially do Illinois National's work for it.

74.     In addition, Illinois National has refused to make any payment toward the 2010-11 Other Claim based on its wrongful assertion that the underlying 2010-11 Nottingham policy limits have not been exhausted, because the Highland Claim, which otherwise would serve to exhaust the 2010-11 Nottingham limits, should be allocated instead to the 2009-10 policy year.

75.     Illinois National also has refused payment on the 2012-13 Other Claims as follows:  (a) it will not pay certain amounts in the Citadel and Universal Green Solutions claims, and (b) it has paid less than owed on the 2012-13 Other Claims based on its wrongful assertion that the *Rhodes* Lawsuit, which would otherwise serve to exhaust the 2012-13 Nottingham limits, should be allocated to the 2009-10 policy year, and has thereby forced C&W to incur more amounts under the 2012-13 Nottingham policy than required to demonstrate exhaustion to Illinois National's satisfaction.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Against Illinois National—Underlying Claims)

76.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     Pursuant to the terms of the Illinois National Policies, Illinois National is obligated to pay claims expenses and damages incurred by C&W in connection with the Underlying Claims, without any right to recoup the amounts paid, as follows:  (1) for the *Gibson* Lawsuit, up to the limits of the Illinois National 2009-10 Policy, (2) for the Highland Claim, up

to the limits of the Illinois National 2010-11 Policy, (3) for the *Blixseth* Lawsuit, up to the limits of the Illinois National 2011-12 Policy, and (4) for the *Rhodes* Lawsuit, up to the limits of the Illinois National 2012-13 Policy.

78.     Illinois National disputes these legal obligations.

79.     Pursuant to 28 U.S.C. § 2201, C&W is entitled to a declaration by this Court of Illinois National's obligations under the Illinois National Policies.

80.     An actionable and justiciable controversy exists between C&W and Illinois National concerning the proper construction of the Illinois National Policies, and the rights and obligations of the parties thereto, with respect to each of the Underlying Claims.

81.     C&W is entitled to a declaration that:  (1) the *Gibson* Lawsuit is covered under the Illinois National 2009-10 Policy, the Highland Claim is covered under the Illinois National 2010-11 Policy, the *Blixseth* Lawsuit is covered under the Illinois National 2011-12 Policy, and the *Rhodes* Lawsuit is covered under the Illinois National 2012-13 Policy, (2) none of the exclusions in any of the Illinois National Policies preclude coverage for any of the Underlying Claims, and (3) Illinois National may not seek reimbursement of any amounts it has paid or in the future will pay under any of the Illinois National Policies for any of the Underlying Claims.

## SECOND CAUSE OF ACTION

### (Declaratory Relief Against Illinois National—Other Claims)

82.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

83.     Pursuant to the terms of the Illinois National Policies, Illinois National is obligated to pay claims expenses and damages incurred by C&W in connection with the Other Claims as follows:  (1) Illinois National must pay for the 2009-10 Other Claim up to the limits of the Illinois National 2009-10 Policy, (2) Illinois National must pay for the 2010-11 Other Claim up to the limits of the Illinois National 2010-11 Policy, and (3) Illinois National must pay for the 2012-13 Other Claims up to the limits of the Illinois National 2012-13 Policy.

84.     Illinois National disputes these legal obligations.

85.     Pursuant to 28 U.S.C. § 2201, C&W is entitled to a declaration by this Court of Illinois National's obligations under the Illinois National Policies.

86.     An actionable and justiciable controversy exists between C&W and Illinois National concerning the proper construction of the Illinois National Policies, and the rights and obligations of the parties thereto, with respect to the Other Claims.

87.     C&W is entitled to a declaration that Illinois National must pay all claims expenses and damages for the 2009-10 Other Claim under the Illinois National 2009-10 Policy, the 2010-11 Other Claim under the Illinois National 2010-11 Policy, and the 2012-13 Other Claims under the Illinois National 2012-13 Policy.

### THIRD CAUSE OF ACTION

### (Declaratory Relief Against ACE)

88.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

89.     If the court determines that the Underlying Claims trigger only the 2009-10 policy year, then ACE must pay under the triggered ACE 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in excess of the Illinois National 2009-10 Policy, up to the limits of the ACE 2009-10 Policy.

90.     Upon information and belief, ACE disputes this legal obligation.

91.     Pursuant to 28 U.S.C. § 2201, C&W is entitled to a declaration by this Court of ACE's obligations under the ACE 2009-10 Policy.

92.     Upon information and belief, an actionable and justiciable controversy exists between C&W and ACE concerning the proper construction of the ACE 2009-10 Policy, and the rights and obligations of the parties thereto, with respect to each of the Underlying Claims.

93.     C&W is entitled to a declaration that:  (1) if the court determines that the Underlying Claims trigger only the 2009-10 policy year, then ACE must pay under the triggered ACE 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in

excess of the Illinois National 2009-10 Policy, up to the limits of the ACE 2009-10 Policy, and (2) no exclusions apply to preclude coverage for any of the Underlying Claims.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief Against Liberty Mutual)

94.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

95.     If the court determines that the Underlying Claims trigger only the 2009-10 policy year, then Liberty Mutual must pay under the triggered Liberty Mutual 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in excess of the ACE 2009-10 Policy, up to the limits of the Liberty Mutual 2009-10 Policy.

96.     Upon information and belief, Liberty Mutual disputes this legal obligation.

97.     Pursuant to 28 U.S.C. § 2201, C&W is entitled to a declaration by this Court of Liberty Mutual's obligations under the Liberty Mutual 2009-10 Policy.

98.     Upon information and belief, an actionable and justiciable controversy exists between C&W and Liberty Mutual concerning the proper construction of the Liberty Mutual 2009-10 Policy, and the rights and obligations of the parties thereto, with respect to each of the Underlying Claims.

99.     C&W is entitled to a declaration that:  (1) if the court determines that the Underlying Claims trigger only the 2009-10 policy year, then Liberty Mutual must pay under the triggered Liberty Mutual 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in excess of the ACE 2009-10 Policy, up to the limits of the Liberty Mutual 2009-10 Policy, and (2) no exclusions apply to preclude coverage for any of the Underlying Claims.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Against RLI)

100.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

101.    If the court determines that the Underlying Claims trigger only the 2009-10 policy year, then RLI must pay under the triggered RLI 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in excess of the ACE 2009-10 Policy, up to the limits of the RLI 2009-10 Policy.

102.    Upon information and belief, RLI disputes this legal obligation.

103.    Pursuant to 28 U.S.C. § 2201, C&W is entitled to a declaration by this Court of RLI's obligations under the RLI 2009-10 Policy.

104.    Upon information and belief, an actionable and justiciable controversy exists between C&W and RLI concerning the proper construction of the RLI 2009-10 Policy, and the rights and obligations of the parties thereto, with respect to each of the Underlying Claims.

105.    C&W is entitled to a declaration that: (1) if the court determines that the Underlying Claims trigger only the 2009-10 policy year, then RLI must pay under the triggered RLI 2009-10 Policy all amounts incurred in connection with each Underlying Claim that are in excess of the ACE 2009-10 Policy, up to the limits of the RLI 2009-10 Policy, and (2) no exclusions apply to preclude coverage for any of the Underlying Claims.

## SIXTH CAUSE OF ACTION

## (Breach of Contract Against Illinois National—Policy Obligations as to Underlying Claims)

106.    C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

107.    The Illinois National Policies constitute valid and enforceable contracts between Illinois National and C&W.

108.    C&W is the named insured under each of the Illinois National Policies.

109.    C&W paid all premiums, provided prompt notice of each of the Underlying Claims, and otherwise performed all obligations required of it under the Illinois National Policies.

110.    Under the express terms of the Illinois National Policies: (1) the *Gibson* Lawsuit triggers coverage under the Illinois National 2009-10 Policy, the Highland Claim triggers

coverage under the Illinois National 2010-11 Policy, the *Blixseth* Lawsuit triggers coverage under the Illinois National 2011-12 Policy, and the *Rhodes* Lawsuit triggers coverage under the Illinois National 2012-13 Policy, (2) Illinois National has no right to recoup any of the amounts it has in the past paid or in the future may pay to C&W with respect to any of the Underlying Claims, and (3) no exclusions in any of the Illinois National Policies apply to preclude coverage for any of the Underlying Claims.

111.    As described above, Illinois National has failed and refused to provide unqualified and timely coverage to C&W for each of the Underlying Claims under the Illinois National policy in effect at the time that each such Claim first was made against C&W.  For these and other reasons, Illinois National has breached the terms and conditions of the Illinois National Policies.

112.    As a direct and proximate result of Illinois National's breach of the Illinois National Policies, C&W has suffered and will suffer damages in an amount to be determined at trial, but in any event no less than the jurisdictional limits of this Court, plus consequential damages, including attorneys' fees, as well pre- and post judgment interest to the extent permitted by law.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract Against Illinois National—Policy Obligations as to Other Claims)

113.    C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

114.    The Illinois National Policies constitute valid and enforceable contracts between Illinois National and C&W.

115.    C&W is the named insured under each of the Illinois National Policies.

116.    C&W paid all premiums, provided prompt notice of each of the Other Claims, and otherwise performed all obligations required of it under the Illinois National Policies.

117.    Under the express terms of the Illinois National Policies, Illinois National must immediately pay:  (1) the 2009-10 Other Claim up to the limits of the Illinois National 2009-10

25

Policy, (2) the 2010-11 Other Claim up to the limits of the Illinois National 2010-11 Policy, and

(3) the 2012-13 Other Claims up to the limits of the Illinois National 2012-13 Policy.

118.    As described above, Illinois National has failed and refused to provide unqualified

and timely coverage to C&W for each of the Other Claims under the Illinois National policy in

effect at the time that each such Claim first was made against C&W.  For these and other

reasons, Illinois National has breached the terms and conditions of the Illinois National Policies.

119.    As a direct and proximate result of Illinois National's breach of the Illinois

National Policies, C&W has suffered and will suffer damages in an amount to be determined at

trial, but in any event no less than the jurisdictional limits of this Court, plus consequential

damages, including attorneys' fees, as well as pre- and post judgment interest to the extent

permitted by law.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract Against Illinois National—Standstill Agreements)

120.    C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of

this Complaint as if fully set forth herein.

121.    The Standstill Agreement and Extended Standstill Agreements constitute valid

and enforceable contracts between Illinois National and C&W.

122.    C&W performed all obligations required of it under the Standstill Agreement and

Extended Standstill Agreements.

123.    In the Standstill Agreement and Extended Standstill Agreements, Illinois National

agreed to timely pay C&W's defense expenditures in the Underlying Claims, including paying

50% of all ongoing expenditures.

124.    As described above, Illinois National has breached its obligations under the

Standstill Agreement and Extended Standstill Agreements.

125.    As a direct and proximate result of Illinois National's breach, C&W has suffered

and will suffer damages in an amount to be determined at trial, but in any event no less than the

jurisdictional limits of this Court, plus consequential damages, including attorneys' fees, as well as pre- and post judgment interest to the extent permitted by law.

**NINTH CAUSE OF ACTION**

**(Breach of Contract Against ACE—Policy Obligations as to Underlying Claims)**

126.  C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

127.  The ACE Policy constitutes a valid and enforceable contract between ACE and C&W.

128.  C&W is the named insured under the ACE Policy.

129.  C&W paid all premiums, provided prompt notice of each of the Underlying Claims, and otherwise performed all obligations required of it under the ACE Policy.

130.  ACE is legally and contractually obligated to, among other things:  (a) respond in a timely manner to C&W's requests regarding coverage positions, (b) respond fully and truthfully to those demands, and (c) treat the financial interests of C&W as at least equal to its own.

131.  ACE breached those obligations by, among other things:  (a) failing to timely respond to Illinois National's assertion that the Underlying Claims are related claims covered solely under the 2009-2010 policy period, and (b) despite promising to do so, failing to timely provide in writing its determination that the Underlying Claims are separate claims triggering separate policy years.

132.  As a result of ACE's breach, and its decision to sit on the sidelines for months before taking any formal position with respect to Illinois National's claims, C&W has been forced to expend resources responding to what should be an intra-insurer coverage dispute, and has suffered and will continue to suffer other damages in an amount to be determined at trial, but in any event no less than the jurisdictional limits of this Court, plus consequential damages, including attorneys' fees, as well as pre-and post judgment interest to the extent permitted by law.

**TENTH CAUSE OF ACTION**

**(Breach of Contract Against ACE—Standstill Agreements)**

133.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

134.     The Standstill Agreement and Extended Standstill Agreements constitute valid and enforceable contracts between ACE and C&W.

135.     C&W performed all obligations required of it under the Standstill Agreement and Extended Standstill Agreements.

136.     As a direct inducement to C&W's willingness to enter into the Standstill Agreement and Extended Standstill Agreements, ACE agreed to timely pay C&W's defense expenditures in the Underlying Claims, including paying 50% of all ongoing expenditures.

137.     ACE has breached its obligations under the Standstill Agreement and Extended Standstill Agreements by failing to make such payment without valid excuse.

138.     As a direct and proximate result of ACE's breach, C&W has suffered and will suffer damages in an amount to be determined at trial, but in any event no less than the jurisdictional limits of this Court, plus consequential damages, including attorneys' fees, as well as pre- and post judgment interest to the extent permitted by law.

**ELEVENTH CAUSE OF ACTION**

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against Illinois National)**

139.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

140.     Illinois National owes a legal and contractual obligation of good faith and fair dealing to its policyholder C&W in its handling of each of the Underlying Claims and the Other Claims.

141.     Illinois National has breached that obligation by, among other things:

(a)     Asserting, in direct contradiction of the plain policy language and its own prior representations, that the Underlying Claims all fall within the Illinois National 2009-10 Policy;

(b)     Without adequate investigation and in contravention of the plain policy language, asserting inapplicable and insupportable defenses to coverage, and threatening that it might choose not to renew its coverage with C&W, in an effort to compel, and for the purpose of compelling, C&W to accede to the treatment of the Underlying Claims as related claims all falling under the 2009-10 policy year;

(c)     Demanding as an impermissible prerequisite to compliance with its obligations under the Illinois National Policies that C&W agree to grant it a right to recoupment not provided under the policy language or applicable law;

(d)     Taking inconsistent positions with respect to the scope and meaning of various policy terms and exclusions, and the Illinois National Policies that are triggered by each of the Underlying Claims, during its communications with C&W regarding the Underlying Claims;

(e)     Unreasonably delaying payment and/or refusing payment for the Other Claims; and/or

(f)     Demanding documents and/or information as a prerequisite to payments under the Standstill Agreement and Extended Standstill Agreements that are either not reasonably necessary to such payments, or had previously been provided, in an effort to avoid the continuing payment that was a direct inducement to C&W's willingness to enter into those Agreements and delay suit against Illinois National.

142.    Illinois National's conduct, as described in part above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of C&W's rights.

143.    Illinois National's positions and conduct with respect to the Underlying Claims and Other Claims is so unreasonable that no other insurer would be expected to assert Illinois National's positions or conduct itself as Illinois National has here.

29

144.     As a direct, proximate, and legal result of Illinois National's wrongful and bad faith conduct, C&W has been forced to incur the expense of filing the present Action to recover benefits owing C&W under the Illinois National Policies.

145.     As a direct, proximate, and legal result of Illinois National's wrongful and bad faith conduct, C&W also has been forced to incur the expense of engaging in extensive correspondence and related legal analysis with Illinois National in an effort to persuade Illinois National to honor its coverage obligations to C&W.

146.     C&W may recover all damages, including attorneys' fees, costs, punitive damages, and other extra-contractual relief that the Court deems just and proper, that result from Illinois National's breach of the duty of good faith and fair dealing.

## TWELFTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against ACE)

147.     C&W repeats and realleges the allegations set forth in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

148.     ACE owes a legal and contractual obligation of good faith and fair dealing to its policyholder C&W in its handling of each of the Underlying Claims.

149.     ACE has breached that obligation by, among other things:

(a)     Failing to timely respond to C&W's requests with respect to the Underlying Claims;

(b)     Failing to timely set forth in writing its determination that the Underlying Claims constitute separate claims triggering coverage under the policy year in which each such Claim was first made, after specifically agreeing that it would do so by a date certain;

(c)     Placing its own financial interests above those of C&W by refusing to negotiate with Illinois National directly regarding which of multiple available policy years and limits should respond to the Underlying Claims, thus forcing C&W to bear the costs of dealing with what should have been an intra-insurer coverage dispute; and/or

(d)     Ignoring documents and/or information sent to it in connection with the payments it promised to make under the Standstill Agreement and Extended Standstill Agreements, and not timely paying its portion of C&W's defense, even though its promise to make those payments was a direct inducement to C&W's willingness to enter into those Agreements and delay suit against ACE.

150.    ACE's conduct, as described in part above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of C&W's rights.

151.    ACE's positions and conduct, as described in part above, is so unreasonable that no other insurer would be expected to conduct itself as ACE has here.

152.    As a direct, proximate, and legal result of ACE's wrongful and bad faith conduct, C&W has been forced to incur unnecessary expenses, including engaging in extensive correspondence and related legal analysis with Illinois National, which instead should have been performed by ACE, in an effort to resolve any existing dispute regarding the policy years triggered by the Underlying Claims to prevent C&W from suffering financial harm as a result of what is an intra-insurer issue and dispute.  C&W also has been forced by ACE's wrongful and bad faith conduct to incur the expense of filing the present Action to recover benefits owing to C&W.

153.    C&W may recover all damages, including attorneys' fees, costs, punitive damages, and other extra-contractual relief that the Court deems just and proper, that result from ACE's breach of the duty of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, C&W prays for relief as follows:

(a)     On the First Cause of Action, declaratory judgment in favor of C&W against Illinois National as set forth in paragraph 81, above;

(b)     On the Second Cause of Action, declaratory judgment in favor of C&W against Illinois National as set forth in paragraph 87, above;

(c)     On the Third Cause of Action, declaratory judgment in favor of C&W against ACE as set forth in paragraph 93, above;

(d)     On the Fourth Cause of Action, declaratory judgment in favor of C&W against Liberty Mutual as set forth in paragraph 99, above;

(e)     On the Fifth Cause of Action, declaratory judgment in favor of C&W against RLI as set forth in paragraph 105, above;

(f)     On the Sixth Cause of Action, judgment against Illinois National, awarding C&W damages in an amount to be determined at trial, but in no event less than the applicable jurisdictional limit, plus pre- and post judgment interest to the extent permitted by law;

(g)     On the Seventh Cause of Action, judgment against Illinois National, awarding C&W damages in an amount to be determined at trial, but in no event less than the applicable jurisdictional limit, plus pre- and post judgment interest to the extent permitted by law;

(h)     On the Eighth Cause of Action, judgment against Illinois National, awarding C&W damages in an amount to be determined at trial, but in no event less than the applicable jurisdictional limit, plus pre- and post judgment interest to the extent permitted by law;

(i)     On the Ninth Cause of Action, judgment against ACE, awarding C&W damages in an amount to be determined at trial, but in no event less than the applicable jurisdictional limit, plus pre- and post judgment interest to the extent permitted by law;

(j)     On the Tenth Cause of Action, judgment against ACE, awarding C&W damages in an amount to be determined at trial, but in no event less than the applicable jurisdictional limit, plus pre- and post judgment interest to the extent permitted by law;

(k)     On the Eleventh Cause of Action, judgment against Illinois National, awarding C&W damages in an amount to be determined at trial, including attorneys' fees, costs, and other extra-contractual relief that the Court deems just and proper;

(l)        On the Twelfth Cause of Action, judgment against ACE, awarding C&W damages in an amount to be determined at trial, including attorneys' fees, costs, and other extra-contractual relief that the Court deems just and proper; and

(m)      On all causes of action, for such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

C&W hereby demands a trial by jury on all issues so triable.

Dated:        November 3, 2014

JENNER & BLOCK LLP

By:        s/ John H. Mathias, Jr.

John H. Mathias, Jr.
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2917
Fax: (312) 840-7317
jmathias@jenner.com

AND

Robin L. Cohen
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
rcohen@kasowitz.com

*Attorneys for Plaintiff*
*Cushman & Wakefield, Inc.*