# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CUSHMAN & WAKEFIELD, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 8725 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| ILLINOIS NATIONAL INSURANCE | ) | |
| COMPANY, ACE AMERICAN | ) | |
| INSURANCE COMPANY, LIBERTY | ) | |
| MUTUAL INSURANCE COMPANY, and | ) | |
| RLI INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Cushman & Wakefield, Inc. ("Cushman") filed a twelve-count complaint against Illinois National Insurance Company ("Illinois National"), ACE American Insurance Company ("ACE"), Liberty Mutual Insurance Company ("Liberty"), and RLI Insurance Company ("RLI") (collectively, "Defendants") seeking a declaration of insurance coverage with respect to certain underlying matters.[1] (Dkt. 1.) Cushman has also brought claims against Illinois National and ACE for breach of contract and breach of the implied covenant of good faith and fair dealing, some of which have been dismissed.[2] (*Id.*; dkt. 63.) Illinois National asserted twelve affirmative

---

[1] The counts in the complaint include: count I, declaratory relief against Illinois National for certain "underlying claims;" count II, declaratory relief against Illinois National for certain "other claims;" count III, declaratory relief against ACE; count IV, declaratory relief against Liberty; count V, declaratory relief against RLI; count VI, breach of contract against Illinois National as to the underlying claims; count VII, breach of contract against Illinois National as to the other claims; count VIII, breach of contract against Illinois National as to certain standstill agreements; count IX, breach of contract against ACE as to the underlying claims; count X, breach of contract against ACE as to the standstill agreements; count XI, breach of the implied covenant of good faith and fair dealing against Illinois National; and count XII, breach of the implied covenant of good faith and fair dealing against ACE. (Dkt. 1.)

[2] ACE moved to dismiss three of the four claims brought against it—count III for declaratory relief, count IX for breach of contract, and count XII for breach of the implied covenant of good faith and

defends and counterclaimed for declaratory relief and recoupment. (Dkt. 84.) ACE similarly asserted thirteen affirmative defenses and counterclaimed for recoupment. (Dkt. 115.) Liberty and RLI also asserted certain affirmative defenses. (Dkts. 108, 112.) Defendants now move for summary judgment in four separate motions, each seeking slightly different relief, as discussed further below. (Dkts. 203, 207, 210, 220.) Cushman also moves for partial summary judgment requesting entry of an order granting judgment in its favor as to counts I, III, IV, V, and VI and dismissing the counterclaims and corresponding affirmative defenses filed by Illinois National and ACE. (Dkt. 221.)[3] For the reasons stated below, Cushman's motion for partial summary judgment is granted in part and denied in part, Illinois National's motion for partial summary judgment is granted in part and denied in part, ACE's motion for summary judgment is denied, Liberty's motion for summary judgment is denied, and RLI's motion for summary judgment is denied.

---

fair dealing. (Dkt. 63.) ACE also moved to strike Cushman's request for consequential damages, attorneys' fees, and punitive damages. (*Id.*) The court dismissed without prejudice the portion of count III directed at ACE's indemnity obligation in connection with a pertinent case (the *Gibson* Action), but otherwise denied the motion to dismiss as to count III. (Dkt. 109.) The court dismissed counts IX and XII with prejudice and denied ACE's motion to strike with respect to consequential damages in connection with count X (the only remaining claim against ACE apart from count III) and granted the motion with respect to attorneys' fees in connection with count X. (*Id.*) Illinois National also filed a motion to dismiss for lack of subject matter jurisdiction (dkt. 58), but the court denied the motion. (Dkt. 79.)

[3] The court's jurisdiction rests on 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## I.    The Insurance Policies

Cushman is the world's largest privately held commercial real estate services firm, offering, among other things, real estate appraisal services for a variety of property types. (Dkt. 225, Cushman's Local Rule 56.1 Statement of Material Facts ("Cushman Stmt.") ¶¶ 35–36.) Between 2009 and 2013, Cushman purchased a series of real estate professional liability insurance policies (collectively, the "Policies") from Defendants. (*Id.* ¶ 1.) The Policies were arranged in tiers, with each policy tier designed to kick in when the coverage provided by the lower-tier insurance policy was exhausted. Nottingham Indemnity, Inc. ("Nottingham"), Cushman's primary insurer during this time period, provided an initial $2 million layer of coverage subject to a $50,000 deductible pursuant to a series of nearly identical annual or bi-annual policies (collectively, the "Nottingham Policies").[5] (*Id.* ¶ 2.) Illinois National served as

---

[4] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court cites to Cushman's statement of material facts where facts are relevant to all parties, and brings in Defendants' statements where necessary to add to or clarify the factual record. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

[5] These policies include, (1) Policy No. 437-1-09-PL01, which was in effect from May 31, 2009 to May 31, 2010 and provided $2 million in coverage, subject to a $50,000 deductible (the "2009-2010 Nottingham Policy") (Dkt. 225, Pl. Ex. 1); (2) Policy No. 437-1-10-PL01, which was in effect from May 31, 2010 to May 31, 2011 and provided $2 million in coverage, subject to a $50,000 deductible (the "2010-2011 Nottingham Policy") (*Id.*, Pl. Ex. 6); (3) Policy No. 437-1-11-PL01, which was in effect from May 31, 2011 to October 21, 2011 and provided $2 million in coverage, subject to a $50,000 deductible (the "2011-2012A Nottingham Policy") (*Id.*, Pl. Ex. 8A); (4) Policy No. 437-1-11-PL01, which was in effect from October 21, 2011 to May 31, 2012 and provided $2 million in coverage, subject to a $50,000 deductible (the "2011-2012B Nottingham Policy") (*Id.*, Pl. Ex. 8B); and (5) Policy No. 437-1-12-PL01, which was in effect from May 31, 2012 to June 30, 2013 and provided $2 million in coverage, subject to a $50,000 deductible (the "2012-2013 Nottingham Policy") (*Id.*, Pl. Ex. 10.)

Cushman's first-level excess insurer between 2009 and 2013 and sold Cushman four insurance policies during that time period (collectively, the "Illinois National Policies").[6] (*Id.* ¶ 3.) The Illinois National policies for the 2009–2010, 2010–2011, and 2011–2012 policy years each provided $23 million in coverage for sums exceeding $2 million.  The policy for 2012–2013 provided $15 million in coverage for sums exceeding $2 million. (*Id.*; Dkt. 225, Pl. Exs. 2, 7, 9, 11.) ACE served as Cushman's second-level excess insurer for the 2009–2010 policy year and sold Cushman Policy No. XEO G23658495 002 (the "ACE Policy"), which was in effect from May 31, 2009 to May 31, 2010. (Cushman Stmt. ¶ 3; Dkt. 225, Pl. Ex. 3.) The ACE Policy provided $10 million in coverage for sums exceeding $25 million. (*Id.*) Liberty and RLI served as Cushman's third-level insurers for the 2009–2010 policy year. Liberty sold Cushman Policy No. EO5N454658004 (the "Liberty Policy"), which was in effect from May 31, 2009 to May 31, 2010. (Cushman Stmt. ¶ 3; Dkt. 225, Pl. Ex. 4.) Similarly, RLI sold Cushman Policy No. EPG0009165 (the "RLI Policy"), which was in effect from May 31, 2009 to May 31, 2010. (Cushman Stmt. ¶ 3; Dkt. 225, Pl. Ex. 5.) Both the Liberty Policy and the RLI Policy provided $7.5 million in coverage for sums exceeding $35 million, for a total of $15 million in coverage. (Cushman Stmt. ¶ 3; Dkt. 225, Pl. Exs. 4, 5.) The Cushman insurance tower for the 2009–2010 policy year is illustrated as follows[7]:

---

[6] These policies include, (1) Policy No. 01-911-84-71, which was in effect from May 31, 2009 to May 31, 2010 and provided $23 million in coverage for sums exceeding $2 million (the "2009-2010 Illinois National Policy") (Dkt. 225, Pl. Ex. 2); (2) Policy No. 01-877-33-21, which was in effect from May 31, 2010 to May 31, 2011 and provided $23 million in coverage for sums exceeding $2 million (the "2010-2011 Illinois National Policy") (*Id.*, Pl. Ex. 7); (3) Policy No. 01-880-59-08, which was in effect from May 31, 2011 to June 30, 2012 and provided $23 million in coverage for sums exceeding $2 million (the "2011-2012 Illinois National Policy") (*Id.*, Pl. Ex. 9); and (4) Policy No. 0230588092, which was in effect from June 30, 2012 to August 31, 2013 and provided $15 million in coverage for sums exceeding $2 million (the "2012-2013 Illinois National Policy") (*Id.*, Pl. Ex. 11.)

[7] Cushman brought this action against Illinois National, ACE, RLI and Liberty under the 2009–2010 policy year and Illinois National under the 2009–2013 policy years.

| Level of Insurance | Insurance Company | Coverage Amount for 2009–2010 Policy Year |
|---|---|---|
| Primary Insurer | Nottingham | $2 million |
| First-Level Excess Insurer | Illinois National | $23 million for sums exceeding $2 million |
| Second-Level Excess Insurer | ACE | $10 million for sums exceeding $25 million |
| Third-Level Excess Insurer | Liberty | $7.5 million for sums exceeding $35 million |
| Third-Level Excess Insurer | RLI | $7.5 million for sums exceeding $35 million |

Nottingham agreed to indemnify Cushman for "all sums in excess of the Deductible which the Insured shall become legally obligated to pay as Damages and Claims Expenses for claims first made against the Insured during the Policy Period . . . as a result of a Wrongful Act of the Insured . . . aris[ing] out of the rendering or failure to render Professional Services." (Cushman Stmt. ¶ 5; Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at § 1.)[8] Nottingham also agreed to defend Cushman and provided that it had "the sole right to appoint counsel and the right and duty to defend any Claim or Suit brought against the Insured seeking Damages on account of a Wrongful Act even if such Claim or Suit is groundless, false or fraudulent."[9] (Cushman Stmt.

---

[8] Slight alterations to the quoted language appear in Pl. Exs. 8B and 10; these changes are inconsequential to resolution of the instant motions.

[9] With respect to defense obligations, the Illinois National Policies provided, "[t]he Insurer shall have the right, in its sole discretion, but not the obligation, to associate effectively with the Company and the Insureds in the defense and settlement of any Claim. . . .The Insurer does not assume any duty to defend any Claim, unless the terms and conditions of the Followed Policy state otherwise, and in such event only to the extent permitted or required by the terms of the Followed Policy." (Cushman Stmt. ¶ 15, Dkt. 225, Pl. Exs. 2, 7, 9, 11 at § VI.) The ACE policy provided, "[t]he Insurer shall have the right, but not the duty, and shall be given the opportunity to effectively associate with the Insureds in the . . . defense of any Claim even if the Underlying Limit has not been exhausted." (Cushman Stmt. ¶ 15, Dkt. 225, Pl. Ex. 3 at § V(E).)

¶ 14; Pl. Exs. 1, 6, 8A–B, 10 at § 2.) Further, the Nottingham Policies defined certain relevant

terms as follows[10]:

- "Damages" means "[a]ny compensatory sum which an Insured is legally obligated to pay for any Claim" including judgments and settlements. (Cushman Stmt. ¶ 6; Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at Defin. 3.)

- "Claims Expenses" are expenses incurred in the "investigation, adjustment, negotiation, arbitration, defense and appeal of any Suit or Claims for Damages." (Cushman Stmt. ¶ 7; Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at Defin. 2.)

- "Wrongful Act" means "[a]ny actual or alleged act, error or omission committed in connection with the conduct of the Insured's Professional Services." (Cushman Stmt. ¶ 8; Dkt. 225, Pl. Exs. 1, 6, 8A at Defin. 9.)[11]

- "Professional Services" means "[a]ll services rendered or to be rendered by the Insured for or on behalf of customers or clients." (Cushman Stmt. ¶ 10; Dkt. 225, Pl. Exs. 1, 6 at Defin. 6.)[12]

- "Claim" means "[a] written demand for money or services naming any Insured and alleging a Wrongful Act to which this policy applies," and "[f]or purposes of this definition, knowledge of a Claim or of a Wrongful Act that could reasonably be expected to result in a Claim shall mean knowledge by the General Counsel and Risk Manager of the Named Insured." (Cushman Stmt. ¶ 12; Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at Defin. 1.)[13]

Defendants' Policies "follow[ed] form to" or adopted the terms and conditions of the

Nottingham Policy for its year, unless expressly stated otherwise. (Cushman Stmt. ¶ 4.)

---

[10] Unless otherwise noted, the definitions are taken from the 2009-2010 Nottingham Policy given that the terms at issue are materially identical in all four years.

[11] "Wrongful Act" in the 2011-2012 and 2012-2013 Nottingham Policies was defined as "[a]ny actual or alleged act, error or omission, breach of duty or event committed in connection with the conduct of the Insured's Professional Services." (Cushman Stmt. ¶ 9; Dkt. 225, Pl. Exs. 8B, 10 at Defin. 11.)

[12] "Professional Services" in the 2011-2012 and 2012-2013 Nottingham Policies was defined as "all services rendered or to be rendered to by the Insured for or on behalf of third parties or that inure to the benefit of the insured." (Cushman Stmt. ¶ 11; Dkt. 225, Pl. Exs. 8A–B, 10 at Defin. 6.)

[13] Slight alterations to the quoted language appear in Pl. Exs. 8B and 10; these changes are inconsequential to resolution of the instant motions.

In addition to laying out indemnification and defense obligations, certain policies also contained exclusions to coverage. Two such exclusions are relevant to the present case. The first—Endorsement # 5, Section 1 ("Endorsement 5"[14]) of the Illinois National Policies—states:

> This policy does not apply to any Claim alleging, arising out of, based upon, resulting from, directly or indirectly, or in any way involving . . . (a) the exercise of any authority or discretionary control by an Insured with respect to any client's funds or accounts; (b) any actual or alleged commingling of funds or monies; (c) an Insured selecting an investment manager, investment advisory or custodial firm; (d) any Insured advising as to, promising or guaranteeing the future value of any investment or any rate of return or interest; or (e) the failure of any investment to perform as expected or desired.[15]

(*Id.* ¶ 18; Dkt. 225, Pl. Exs. 2, 7, 9 at Endmt. 5; Pl. Ex. 11 at Endmt. 13.)

The second—the "Prior Knowledge Exclusion" to the Nottingham Policies—states:

> This Policy does not apply . . . to any Claim arising from any Wrongful Act committed prior to the beginning of the Policy Period, if on or before the inception date of this Policy any Insured knew of such Claim or the occurrence of a Wrongful Act that could reasonably be expected to result in such Claim.

(Cushman Stmt. ¶ 30; Dkt. 225, Pl. Exs. 1, 6 at Excl. 8; Pl. Exs. 8A–B, 10 at Excl. 7.)

The Nottingham Policies and the Illinois National Policies also contained provisions delineating when certain Wrongful Acts would be considered the same as or related to another Wrongful Act (the "Related Wrongful Act Provisions"). The Nottingham Policies provide:

---

[14] Cushman refers to Endorsement 5 as the Investment Advisor Exclusion, while Illinois National refers to Endorsement 5 as the Miscellaneous Exclusion. The title of this endorsement is relevant to resolution of the issues before the court, so the court refers to Endorsement 5 by its generic name, rather than the titles provided by the parties. The court recognizes that the Illinois National Policies refer to this endorsement as both Endorsement # 5 and the Miscellaneous Exclusions Endorsement. Further, any mention of Endorsement 5 in this opinion refers to Endorsement 5, Section 1, unless otherwise noted.

[15] This exclusion does not apply to Cushman & Wakefield Securities, Inc., a Cushman broker-dealer subsidiary. (Cushman Stmt. ¶ 19; Dkt. 225, Pl. Exs. 2, 7, 9 at Endmt. 5; Pl. Ex. 11 at Endmt. 13.)

> If additional Claims are subsequently made which arise ou[t] of the same Wrongful Act as Claims already made and reported to the Company, all such Claims, whenever made, shall be considered first made when the earliest Claim arising out of such Wrongful Act was made and all such Claims shall be subject to one such Limit of Liability.
>
> For purposes of the Limits of Liability, a series of continuous, repeated or *interrelated Wrongful Acts shall be considered as one Wrongful Act.*

(Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at Limits of Liability.) The Illinois National Policies also state:

> If during the Policy Period . . . (i) written notice of a Claim has been given to the Insurer . . . or (ii) . . . written notice of circumstances that may reasonably be expected to give rise to a Claim has been given to the Insurer, then any Claim that is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim or circumstances of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim or circumstances of which such notice has been given, shall be considered made at the time such Claim or circumstances has been given to the Insurer.

(Cushman Stmt. ¶ 31; Dkt. 225, Pl. Exs. 2, 7, 9, 11 at § V(b).)

## II.    The Underlying Claims

From 2004 to 2007, certain Credit Suisse AG entities ("Credit Suisse") retained various Cushman subsidiaries to perform real estate appraisals in connection with loans made to developers of large, master-planned residential communities ("MPCs"). (Cushman Stmt. ¶¶ 38–39.) In preparing the appraisals, Cushman used a Total Net Value ("TNV") methodology.[16] (*Id.* ¶ 40.) TVN is defined as "the sum of the market value of the bulk lots of the entire planned community, as if all of the bulk lots were complete (in terms of backbone and infrastructure) and available for sale to merchant builders, as of the date of the appraisal. . . . It does not reflect the deduction for developers profit or the time value of money." (*Id.* ¶ 44; *See, e.g.*, Dkt. 225, Pl. Ex. 42 at 2.) Between 2008 and 2010, several of the loans went into default and lawsuits surrounding the use of the TNV appraisal method were brought against Cushman, certain of its subsidiaries,

---

[16] This methodology was later renamed the Total Net Proceeds methodology.

and others. (Cushman Stmt. ¶¶ 67–68.) Cushman's alleged role was to appraise the MPCs improperly using the TNV definition, which resulted in a higher valuation than a more standard "market value" appraisal. (*Id.* ¶ 73.) Credit Suisse could then allegedly earn fees by originating and servicing large syndicated loans using the MPCs as collateral. (*Id.* ¶ 72.) The claims included four specific claims (the "Underlying Claims") as well as a handful of additional claims arising out of the Credit Suisse appraisals (the "Other Claims"). (*Id.*) The Underlying Claims included (1) a January 3, 2010 putative class action lawsuit filed in the District of Idaho on behalf of property owners in various MPCs, *Gibson* v. *Credit Suisse AG*, No. 1:10-cv-00001 (the "*Gibson* Action")[17]; (2) a November 2010 demand by a hedge fund that purchased shares of syndicated loans Credit Suisse originated using the appraised properties as collateral (the "Highland Demand")[18]; (3) a February 14, 2012 lawsuit filed in the District of Colorado by a shareholder in a MPC developer, *Blixseth* v. *Cushman & Wakefield of Colorado, Inc.*, No. 1:12-cv-00393 (the "*Blixseth* Action"); and (4) a January 25, 2013 third-party lawsuit filed in the United States Bankruptcy Court for the District of Nevada by a MPC developer, *Rhodes* v. *Credit Suisse AG*, No. 2:12-cv-01272 (the "*Rhodes* Action"). (*Id.* ¶¶ 67–71, 75; Dkt. 225, Pl. Exs. 12, 16, 19, 23.)

More specifically, plaintiffs in the *Gibson* Action are individuals and entities that purchased homes or lots at four MPCs: Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn sur Mer. (Dkt. 208, Illinois National's Local Rule 56.1 Statement of Material Facts ("Illinois National Stmt.") ¶ 26.) Timothy Blixseth, founder; manager; and developer of Yellowstone, filed

---

[17] The Fifth Amended Complaint is the operative complaint in the *Gibson* Action. (*See* Dkt. 225, Pl. Ex. 14.)

[18] This demand did not result in the filing of a lawsuit against Cushman or its subsidiaries.

the *Blixseth* Action.[19] (*Id.* ¶ 47.) The Highland Demand involved plaintiffs whose claims arose out of loans involving, among others, Yellowstone Club, Ginn Clubs & Resorts, and Rhodes Ranch. (*Id.* ¶ 37.) Finally, the *Rhodes* Action was brought by certain borrowers, including Rhodes Ranch. Not only did the Underlying Claims involve overlapping properties, but all Underlying Claims also alleged that Credit Suisse and Cushman conspired to intentionally overvalue the MPCs so Credit Suisse could generate fees and that the TNV appraisals were inherently misleading. (*Id.* ¶ 55; Cushman Stmt. ¶¶ 72–73.) Plaintiffs in the *Gibson* Action claimed that the alleged scheme began at Lake Las Vegas and was repeated at various properties around the country. (Dkt. 225, Pl. Ex. 14 ¶ 53.)

The court in the *Gibson* Action granted Cushman's motion for summary judgment and dismissed the case with prejudice as to Cushman. (Cushman Stmt. ¶ 83; Dkt. 225, Pl. Ex. 15.) Plaintiffs appealed to the Ninth Circuit and the case was argued on February 9, 2018. *See Gibson* v. *Credit Suisse Group Securities*, No. 16-35705 (9th Cir. Aug. 29, 2016). The parties await a decision from the appellate court. The court in the *Blixseth* Action dismissed the case in a decision subsequently upheld by the Tenth Circuit. (Cushman Stmt. ¶ 86; Dkt. 225, Pl. Exs. 17–18.) The Highland Demand was settled for $12 million while the *Rhodes* Action was settled for $362,500. (Cushman Stmt. ¶ 87; Dkt. 225, Pl. Exs. 22, 24.)

## III.     Notice of and Communications Related to the Underlying Claims

### A.     The *Gibson* Action

Cushman provided notice to Defendants of the *Gibson* Action on January 12, 2010, during the 2009–2010 policy period. (Cushman Stmt. ¶ 90; Dkt. 225, Pl. Ex. 45.) After receiving notice, Illinois National sent Cushman a reservation of rights letter on February 9, 2010,

---

[19] On July 22, 2011, Blixseth attempted to intervene in the *Gibson* Action, but the motion for intervention was denied. (*Id.* ¶¶ 42, 44, 46.)

accepting the *Gibson* Action as a Claim under the 2009-2010 Illinois National Policy. (Cushman Stmt. ¶ 91; Dkt. 225, Pl. Ex. 46.) The letter also contained the following statement: "This letter is not, and should not be construed as a waiver of any terms, conditions, exclusions or other provisions of the [Illinois National] Policy, or any other policies of insurance issued by Illinois National or any of its affiliates." (Dkt. 225, Pl. Ex. 46.)

B.      **The Highland Demand**

In October 2010, Cushman advised Illinois National of claims alleged by Highland Capital in an email noting that Cushman was providing some "supplemental information related to the L.J. Gibson and Beau Blixseth legal action." (Cushman Stmt. ¶ 90, Dkt. 225, Pl. Ex. 47; Illinois National Stmt. ¶ 64.) On October 7, 2010, Cushman's Risk Manager emailed Cushman's broker and informed her that since the Highland matter "is directly related to the Credit Swiss [*sic*] claim reported to underwriters in the 2009-2010 policy year, please treat the Highland Capital matter as a continuation of the same claim and report to the underwriters under the 2009-2010 program." (Illinois National Stmt. ¶ 65; Dkt. 209, Illinois National Ex. FF.) Cushman also reached out to Illinois National in March 2011 to confirm that its insurers agreed that the Highland matter should be treated as related to the *Gibson* Action, and Cushman explained to Illinois National in April 2011:

> The Highland Capital claim was categorized as a subset of the Credit Suisse claim because its genesis is [] many of the same loans made by Credit Suisse based upon the appraisal work performed by [Cushman], all at issue in the Gibson lawsuit. Highland Capital funds were members of the syndicates established by Credit Suisse in connection with the syndication of the various resort loans.

(Illinois National Stmt. ¶¶ 68–70; Dkt. 209, Illinois National Exs. GG, HH, II.) Cushman and Highland also entered into a tolling agreement in 2010 in an attempt to find an amicable resolution and avoid litigation; this agreement was terminated on June 11, 2013. (Illinois

National Stmt. ¶¶ 35–36, 95; Dkt. 209, Illinois National Ex. QQ.) Just before this termination, Cushman's loss run (as of May 31, 2013) listed the *Gibson* Action, the Highland Demand, and the *Blixseth* Action under the 2009–2010 policy year, and bracketed the three matters together. (Illinois National Stmt. ¶ 103; Dkt. 209, Illinois National Ex. UU.) Similarly, on June 14, 2013, Cushman asked that the insurers be notified that the "Highland Capital claim, reported in the 2009/2010 claim year," was no longer dormant and that Highland Capital affirmatively stated it would bring suit against Cushman. (Illinois National Stmt. ¶ 100; Dkt. 209, Illinois National Ex. TT.) The email also asked that notice to the insurer be provided "for that particular claim year." (*Id.*) But by July 23, 2013, Cushman asserted, "[U]pon reviewing the Highland lawsuits and other documents, we noted numerous distinguishing characteristics of Highland's claims as compared to Gibson/Blixseth's claims that lead us to believe that the claims should be paid out of the 2010/11 claim year based on the timing of Highland's notice of the claims to [Cushman]."[20] (Illinois National Stmt. ¶ 99; Dkt. 209, Illinois National Ex. SS.)

C.     The *Blixseth* Action

Cushman also put Illinois National on notice of Timothy Blixseth's intervening complaint in the *Gibson* Action on July 25, 2011, noting that the "factual background for the new complaint is substantively identical to that of the existing Gibson action." (Illinois National Stmt. ¶ 43; Dkt. 209, Illinois National Ex. W.) On April 24, 2012, Cushman's risk management department asked that the insurers be put on notice of the *Blixseth* Action and advised that it "is related to the Gibson/Credit Suisse claim filed in the 2009–2010 year." (Illinois National Stmt. ¶ 73, Dkt. 209, Illinois National Ex. JJ.)

---

[20] In or around May 2013 in a series of letters and emails, Cushman began disagreeing that the TNV appraisals related back to the 2009–2010 policy year. (*See* Dkt. 278 ¶ 11.)

**D.      The Notice of Circumstances and Supplemental Reservation of Rights**

In June 2012, approximately two years after receiving notice of the *Gibson* Action,

Illinois National requested that Cushman provide it with a notice of circumstances ("NOC") for

all other TNV appraisals. (Cushman Stmt. ¶ 95; Dkt. 225, Pl. Ex. 50.) Cushman sent a NOC

letter on June 28, 2012, which attached a list of appraisals done using the TNV method of which

Cushman was aware and stated that with regard to future claims based on TNV appraisals, "to

the extent a 'Claim' is ultimately made against the 'Insureds' for an alleged 'Wrongful Act' as

discussed below, you shall treat the 'Claim' as having been made during the currency of policy

no. 01-880-59-08 for the 2011–2012 policy year." (Cushman Stmt. ¶ 95; Dkt. 225, Pl. Ex. 51.)

Illinois National acknowledged receipt of the NOC on July 9, 2012, and provided an initial

coverage position, reserving rights under the 2011–2012 Illinois National Policy. (Cushman

Stmt. ¶ 96; Dkt. 225, Pl. Ex. 52.)

On August 7, 2012, Illinois National issued a supplemental reservation of rights letter,

which pointed out potential defenses based on Endorsement 5, the Prior Knowledge Exclusion,

and fortuity. (Cushman Stmt. ¶ 99; Dkt. 225, Pl. Ex. 53.) The letter also asserted that the

Underlying Claims all related to the *Gibson* Action, and thus fell within coverage of the 2009–

2010 Policies, "because the appraisals performed on the four MPC projects all used the [TNV]

method." (Cushman Stmt. ¶ 102; Dkt. 225, Pl. Ex. 53 at 5.) In November 2012, Illinois National

further notified Cushman that any appraisal listed in the NOC would be deemed to fall under the

2009–2010 policy period, and that the 2011–2012 claim file would be closed. (Cushman Stmt. ¶

106; Dkt. 225, Pl. Ex. 54.) On May 21, 2013, Cushman sent a letter to Illinois National stating

that it disagreed with Illinois National's conclusion that "all claims which may be made in the

future that claim some damages resulting from Total Net Value Appraisals are related to the

*Gibson* class action suit and the *Blixseth* suit and should be considered as one claim under the 2009-2010 policy." (Dkt. 225, Pl. Ex. 57.) On January 24, 2014, Illinois National again issued a supplemental reservation of rights letter, stating that it had "discovered" additional factual bases for its assertion that coverage for the Underlying Claims was barred by the Prior Knowledge Exclusion and/or because they were "fortuitous." (*Id.*¶ 112; Dkt. 225, Pl. Ex. 64.)

### D. The *Rhodes* Action

Meanwhile, on April 1, 2013, Cushman gave notice of the *Rhodes* claim. (Cushman Stmt. ¶ 107; Dkt. 225, Pl. Ex. 55.) On April 7, 2013, Illinois National acknowledged receipt of the notice of claim, citing to the 2012–2013 Illinois National Policy. (Cushman Stmt. ¶ 107; Dkt. 225, Pl. Ex. 56.) Four months later, on July 26, 2013, Illinois National determined that "[u]pon further review of the Rhodes Complaint," it related to the *Gibson* Action, and thus would be considered under the 2009–2010 policy year. (Cushman Stmt. ¶ 108; Dkt. 225, Pl. Ex. 59.)

## IV. The Standstill Agreement

On April 14, 2014, Cushman, Illinois National, and ACE entered into a Standstill Agreement in an effort to secure payment for the Highland and *Rhodes* settlements and to ensure that defense costs for the *Gibson* and *Blixseth* Actions would continue to be paid. (Cushman Stmt. ¶ 136; Dkt. 225, Pl. Ex. 69.) Illinois National and ACE agreed to equally split the ongoing defense costs related to the Underlying Claims, Illinois National agreed to fund the *Rhodes* settlement for $362,500, and Illinois National and ACE agreed to fund the Highland settlement, with Illinois National paying $10 million and ACE paying $2 million. (*Id.*) The parties agreed to table an ongoing issue of whether Illinois National and ACE had any rights to recoupment. (Cushman Stmt. ¶ 136–37; Dkt. 225, Pl. Ex. 69.) To date, Illinois National has paid more than $26 million and ACE has paid more than $7 million in defense and indemnity payments for the

Underlying Claims. (Cushman Stmt. ¶¶ 88–89; Dkt. 225, Pl. Exs. 70–71.)

## V. Overview of the Motions for Summary Judgment

Defendants and Cushman have each filed separate motions for summary judgment. Given the complexity and disparate nature of the relief sought by the parties, the details of each motion are outlined below.

### A. Illinois National's Motion for Summary Judgment

Illinois National asks the court to declare that Endorsement 5 of the Illinois National Policies and the Prior Knowledge Exclusion of the Nottingham Policies apply to preclude all coverage under the Illinois National Policies for the Underlying Claims, and to grant judgment in its favor on Illinois National's counterclaim for recoupment of all defense costs and indemnity payments in an amount to be determined by the court. (Dkt. 207.) In the alternative, Illinois National seeks a declaration that the *Blixseth* Action, the Highland Demand, and the *Rhodes* Action are related to the *Gibson* Action, which would trigger only the 2009–2010 Illinois National Policy, and asks the court to order Cushman to reimburse Illinois National for all payments of defense costs and indemnity in excess of the $23 million Illinois National limit. (*Id.*) In the second alternative, Illinois National asks the court to find and declare that Endorsement 5 and the Prior Knowledge Exclusion apply to exclude coverage for the *Blixseth* Action, the Highland Demand, and the *Rhodes* Action under the 2011, 2012, and 2013 Illinois National Policies, and order that Cushman reimburse Illinois National for all payments of defense costs and indemnity paid for the *Blixseth* Action, the Highland Demand, and the *Rhodes* Action. (*Id.*)

### B. ACE's Motion for Summary Judgment

ACE moves for summary judgment on count III (declaratory relief against ACE), asking the court to declare that the ACE Policy does not provide coverage for the matters described in

the Complaint. (Dkt. 210.) Unlike Illinois National, ACE contends that the *Blixseth* Action, the Highland Demand, and the *Rhodes* Action are not related to the *Gibson* Action. In other words, each action triggers coverage under a separate policy year and the ACE Policy is not triggered because the primary and first-insurer policies have not been exhausted. (Dkt. 213.) ACE further argues that the ACE Policy has not been triggered because all loss arising from the *Gibson* Action, the *Blixseth* Action, and the *Rhodes* Action is precluded by Endorsement 5. (*Id.*) ACE also moves for summary judgment on count X (breach of contract against ACE as it pertains to the Standstill Agreement) under the theory that Cushman has failed to establish damages attributable to ACE. (*Id.*) Finally, ACE asks the court to grant judgment on its counterclaim for recoupment of amounts advanced pursuant to the Standstill Agreement because, according to ACE, the ACE Policy has not been triggered. (*Id.*)

### C. Liberty Mutual's Motion for Summary Judgment

Like ACE, Liberty Mutual requests a declaration that each of the Underlying Claims is covered under a separate policy year because, among other reasons, the *Blixseth* Action, the Highland Demand, and the *Rhodes* Action are not related to the *Gibson* Action. Such a declaration would mean that the Liberty Policy is not triggered because the primary, first-insurer and second-insurer policies have not been exhausted. Liberty Mutual also contends that no policy exclusions apply to preclude coverage of the Underlying Claims.

### D. RLI's Motion for Summary Judgment

RLI does not ask the court to determine whether the Underlying Claims are related.[21] Instead, it seeks a declaration that Endorsement 5 precludes coverage for the Highland Demand. If true, even if the Underlying Claims are related, the RLI Policy would not be triggered.

---

[21] RLI notes it does not dispute the position that the Underlying Claims are unrelated and constitute claims made within different policy years.

### E.    Cushman's Motion for Summary Judgment

Cushman moves for partial summary judgment in its favor as to counts I, III, IV, V, and VI and as to the counterclaims and corresponding affirmative defenses filed by Illinois National and ACE. As to count I—declaratory relief against Illinois National—Cushman asks for a declaration against Illinois National that: (1) the Underlying Claims are covered by the Policies; (2) no exclusions apply to preclude coverage for any of the Underlying Claims; (3) the Highland Demand is not related to the *Gibson* Action, the *Blixseth* Action, or the *Rhodes* Action; and (4) Illinois National may not seek reimbursement of any amounts it has paid or in the future will pay under any of the Illinois National Policies for any of the Underlying Claims. In counts III, IV, and V, Cushman seeks declarations against ACE, Liberty, and RLI, respectively, that if the Underlying Claims are related and thus trigger only the 2009–2010 policy year, ACE, Liberty, and RLI must pay under the triggered 2009–2010 policies all amounts incurred in connection with the Underlying Claims that are in excess of the 2009–2010 Illinois National Policy (as to ACE) and the 2009–2010 ACE Policy (as to Liberty and RLI), up to their respective policy limits. Cushman also asks the court to declare that no exclusions apply to preclude coverage for any of the Underlying Claims with respect to these counts. In count VI, Cushman seeks to recover damages from Illinois National for breach of contract as to the Underlying Claims. Finally, Cushman seeks a declaratory judgment that Illinois National and ACE are not entitled to recoupment.

### LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24. "The interpretation of an insurance policy is a question of law that is an appropriate subject for disposition by way of summary judgment." *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000).

## ANALYSIS

Although each party makes slightly different arguments, there are three primary issues at play: (1) whether a policy exclusion precludes coverage for one or more of the Underlying Claims; (2) whether the Underlying Claims are related, triggering only the 2009–2010 Illinois National Policy, or whether one or more of the Underlying Claims sits within a different policy year; and (3) whether Illinois National and/or ACE are entitled to recoupment or reimbursement. The court will address each of these issues in turn, but first turns to choice of law.

## I.    Choice of Law

At first blush, the parties appear to agree that New York law applies to the interpretation of the Policies. Cushman, Illinois National, ACE, and RLI agree that New York law should govern, and Liberty did not address choice of law in its motion for summary judgment. Given that "we forego choice of law analysis when the parties agree on the law that governs a dispute and there is a reasonable relation between the dispute and the forum whose law has been selected," the court could simply apply New York law. *Home Valu, Inc.* v. *Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000). Liberty, however, asserts for the first time in its response to the parties' motions for summary judgment that Illinois law should govern questions of policy interpretation.[22] (See Dkt. 262 at 2–5.) The court thus undertakes a choice of law analysis.

Federal courts sitting in diversity apply the choice-of-law rules of the forum state, in this case Illinois. *Hinc* v. *Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Under Illinois law, a choice of law analysis is "required only when a difference in law will make a difference in the outcome." *Townsend* v. *Sears, Roebuck & Co.*, 879 N.E.2d 893, 898, 227 Ill.2d 147, 316 Ill. Dec. 505 (Ill. 2007). "The party seeking the choice-of-law determination bears the burden of demonstrating a conflict." *Bridgeview Health Care Ctr., Ltd.* v. *State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905, 2014 IL 116389, 381 Ill. Dec. 493 (Ill. 2014). Illinois National identifies one such conflict—Illinois law does not generally recognize a right of recoupment of defense costs

---

[22] Having not addressed the choice of law issue in its opening brief, Liberty asserts for the first time in its response to the parties' motions for summary judgment that Illinois law should govern questions of policy interpretation. (*See* Dkt. 262 at 2–5.) Liberty points out that Cushman, ACE, and RLI identify no conflict between Illinois and New York law. (*Id.* at 2.) With regard to the conflict identified by Illinois National, Liberty argues on one hand that "Illinois follows the doctrine of *depecage*, which refers to the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis," and on the other that where "remedial issues are so bound up with substantive issues [] they ought to be decided according to the same law that governs the substantive issues." (*Id.* at 2, 4–5.) The court agrees that resolution of the right of recoupment issues is bound up with resolution of the other matters at issue and thus will apply the law governing the substantive issues, which, as identified in the body of this opinion, is New York law.

while New York does. *Compare Gen. Agents Ins. Co. of Am., Inc.* v. *Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1102, 215 Ill.2d 146, 293 Ill. Dec. 594 (Ill. 2005) *with United Specialty Ins. Co.* v. *CDC Hous., Inc.*, 233 F. Supp. 3d 408 (S.D.N.Y. 2017).

When an insurance policy lacks a choice of law provision, Illinois courts employ a "most significant contacts" test to determine the governing substantive law for the contract. *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). Under this test, Illinois courts consider "the location of the subject matter, the place of delivery of the contract, the domicile of the insured or the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Lapham-Hickey Steel Corp.* v. *Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845, 166 Ill.2d 520, 211 Ill. Dec. 459 (Ill. 1995). Some courts have placed particular emphasis on "the law of the State where the policy was issued or delivered or [] the law of the place of the last act to give rise to a valid contract." *See, e.g.*, *United States Fire Ins. Co.* v. *CNA Ins. Cos.*, 572 N.E.2d 1124, 1127, 213 Ill. App.3d 568, 157 Ill. Dec. 660 (Ill. 1991). Further, the location of the subject matter of the contract, such as the location of the risk insured by an insurance policy, is entitled to little weight when the subject matter of the risk is located in more than one state. *Jupiter Aluminum Corp.*, 225 F.3d at 873–74 (7th Cir. 2000).

Here, Cushman is a corporation organized under the laws of New York, with its principal place of business in New York. The Policies were all addressed and delivered to Cushman's headquarters in New York. Further, the 2009–2010 and 2010–2011 Policies were negotiated by Cushman's insurance broker out of their offices in New York and both Illinois National and ACE issued their policies from offices in New York. The policies cover nationwide risks and thus given the aforementioned facts, New York bears a strong rational relationship to the general

contract. The court will therefore apply New York law.

## II.     Insurance Policy Interpretation

Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp.* v. *Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). An insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms. *See Breed* v. *Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). If the language of the insurance contract is unambiguous, the court applies its terms. *Andy Warhol Found. for Visual Arts, Inc.* v. *Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999). Where its terms are reasonably susceptible to more than one interpretation, the policy must be regarded as ambiguous. *See Haber* v. *St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998). "When a court decides, after examination of the contractual language, that an insurance policy is ambiguous, it looks outside the policy to extrinsic evidence, if any, to ascertain the intent of the parties." *Andy Warhol*, 189 F.3d at 215. If the ambiguities cannot be resolved by examining the parties' intentions, the court may apply other rules of contract construction, including the rule that ambiguities in the policy should be construed in favor of the insured, because as the drafter of the policy the insurer is responsible for the ambiguity. *Morgan Stanley Group Inc.* v. *New Eng. Ins. Co.*, 225 F.3d 270, 275–76 (2d Cir. 2000). This rule is especially applicable where the ambiguity appears in a clause excluding coverage. *Breed*, 385 N.E.2d at 1284. In order to "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Belt Painting Corp.* v. *TIG Ins. Co.*, 795 N.E.2d 15, 17 (N.Y. 2003). Policy exclusions are "given a strict and narrow construction, with any ambiguity resolved against the insurer." *Id.* While the insured bears the burden of

establishing coverage, the insurer bears the burden of establishing the applicability of exclusions. *See Consol. Edison Co. of N.Y.* v. *Allstate Ins. Co.*, 774 N.E.2d 687, 98 N.Y.2d 208, 218 (N.Y. 2002); *AGCS Marine Ins. Co.* v. *World Fuel Servs., Inc.*, 187 F. Supp. 3d 428, 438 (S.D.N.Y. 2016).

## III. The Exclusions

### A. Endorsement 5

The parties argue differing interpretations of Endorsement 5 of the Illinois National 2009–2010 Policy. The terms of a contract are clear and unambiguous when the language used has a definite and precise meaning and there is no reasonable basis for a difference of opinion. *Fernandez* v. *Price*, 880 N.Y.S.2d 169, 172 (N.Y. App. Div. 2009). Conversely, contract language is ambiguous when it is reasonably susceptible to more than one interpretation, and extrinsic or parol evidence may then be permitted to determine the parties' intent as to the meaning of that language. *Id.* Here, two reasonable interpretations exist. Illinois National refers only to parts (d) and (e) of Endorsement 5 and argues that the undefined term "investment" as used in that endorsement must be given the dictionary definition of the term and thus applies to real estate appraisals.[23] (*See, e.g.*, Dkt. 209 at 25–26 (citing Merriam-Webster Dictionary definition of "investment" as "the outlay of money usually for income or profit: capital outlay; also: the sum invested or the property purchased.")).[24] Cushman, in contrast, argues that

---

[23] ACE and RLI make similar arguments, while Liberty maintains that no policy exclusions apply.

[24] RLI relies on a handful of cases in an attempt to demonstrate that the word "investment," is unambiguous. *See Taylor* v. *Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340 (Mo. 2015); *Centerboard Sec., LLC* v. *Benefuel, Inc.*, No. 3:15-CV-2611-G, 2017 WL 273881 (N.D. Tex. Jan. 20, 2017); *Jasco Tools, Inc.* v. *Am. Mfrs. Mut. Ins. Co.*, 673 N.Y.S.2d 864 (N.Y. Sup. Ct. 1998). None of these cases contain contractual language directly parallel to the language at issue nor are they factually on all fours with the present case. Thus, given the fact-intensive nature of the determination at hand, these cases are inapplicable.

"investment" cannot be read in a vacuum and when viewed in context of subsections (a)–(c), the endorsement was intended to preclude coverage only for securities-related activities typically undertaken by investment advisors. Given that "single clauses cannot be construed by taking them out of their context," there are two reasonable interpretations of the endorsement.[25] *GMAC Commercial Fin., LLC* v. *Ahn*, No. 600673-2009, 2011 WL 2449024, at *3 (N.Y. Sup. Ct. June 15, 2011). The court thus looks to relevant extrinsic evidence to determine the parties' intent as to the meaning of the language in Endorsement 5. Both parties present a multitude of parol evidence; the court considers all such evidence but discusses only the most pertinent evidence below.

First, Illinois National has submitted regulatory filings in several states, which include an "Investment Advisor Exclusion," featuring nearly identical language to the exclusion at issue here.[26] (*See* Dkt. 225, Pl. Exs. 39–41.) In certain of those filings, the purpose of the exclusion is described as excluding Claims "arising from wrongful acts while providing professional services as an investment advisor," or from "professional services provided by an investment advisor." (Dkt. 225, Pl. Exs. 40–41.) Illinois National hangs its hat on the fact that in contrast to those

---

[25] Illinois National's broad interpretation of "investment" in the context of Endorsement 5, Section 1(e), which precludes coverage for "any Claim alleging, arising out of, based upon, resulting from, directly or indirectly, or in any way involving . . . the failure of any investment to perform as expected or desired," could render the provision illusory. (Dkt. 225, Pl. Ex. 2 at Endorsement 5, Section 1(e).) Such a reading creates ambiguity as it would essentially eliminate coverage for all Claims brought in connection with Cushman's appraisal business, including Claims brought by plaintiffs who objected to how Cushman appraised the value of commercial property, regardless of the appraisal method used. The court cannot accept an interpretation that would render superfluous the provision of coverage. *See Nat'l Union Fire Ins. Co.* v. *Am. Re-Ins. Co.*, 351 F. Supp. 2d 201, 210 (S.D.N.Y. 2005) (finding ambiguity where a literal reading would be "limitless" and lead to an "absurd and unreasonable result").

[26] Illinois National notes that although it contains identical language, the regulatory filing in New York is a directors & officers' policy, rather than a professional liability policy, and that the Illinois regulatory filing contains additional language distinct from that in the policy at issue. The court takes these observations into account but notes that these differences are not dispositive given the overlapping language at issue.

filings, Endorsement 5 is titled "Miscellaneous Exclusions Endorsement," rather than "Investment Advisor Exclusion." This is simply a distraction. Unlike the stand-alone exclusions in the regulatory filings, Endorsement 5 contains additional exclusions grouped under a single endorsement. As Illinois National's underwriter explained, Endorsement 5 is "a list of typical exclusions . . . that aren't contained in the Nottingham policy." (Dkt. 225, Pl. Ex. 82 at 130:13–16.) Given that Illinois National presents the relevant exclusionary language to its regulators in multiple states as an exclusion pertaining to investment advisor activities, it is likely that the same interpretation governs here.

Second, Cushman's insurance industry custom and practice expert Tom Baker asserts that "under the custom and practice in the liability insurance market, the exclusion would apply only to claims that arise when a real estate company decides to dabble in the kinds of activities that are conducted by investment advisors, not to claims that arise when the company engages in its core real estate professional activities, such as conducting property appraisals."[27] (Dkt. 225, Pl. Ex. 90 ¶¶ 65–67.) Further, Illinois National's underwriter testified that Endorsement 5, Section 1(a)–(e) is a "series of exclusions around investment activity," that the exclusions are "commonly used" and "should be used in any policy where we think an insured . . . can be giving investment advice, that they can be guaranteeing the future value, comingling of funds," and that "we're definitely not covering things an investment advisor would do." (Dkt. 225, Pl. Ex. 82 at 131:3–132:18.) Despite Illinois National's contention to the contrary, this testimony does not indicate that Endorsement 5 pertains to activities other than those performed by an investment advisor.

---

[27] This court previously ruled that paragraphs 65–67 of Tom Baker's expert report (dkt. 225, Pl. Ex. 90) are appropriate expert opinions and admissible. (Dkt. 351 at 5.)

Third, Illinois National points to the fact that plaintiffs in the Underlying Claims referred to their involvement with the relevant properties as "investments." Such a reference, however, does not lead to the conclusion that this is the type of investment contemplated by the language of Endorsement 5.

Given the aforementioned evidence, the court finds that, to the extent they argue for application of Endorsement 5, the insurers have not met their burden. They have failed to "establish that the exclusion is stated in clear and unmistakable language," and have not shown that "it is subject to no other reasonable interpretation, and applies in the [present] case." *Belt Painting*, 795 N.E.2d at 17. Moreover, policy exclusions are "given a strict and narrow construction, with any ambiguity resolved against the insurer."[28] *Id.* Under these principles, as a matter of law and undisputed fact Endorsement 5 does not bar coverage for the Underlying Claims.

## B.     Prior Knowledge Exclusion

Illinois National also argues that the Prior Knowledge Exclusion in the Nottingham Policies, to which the Illinois National Policies follow form, bars coverage for the Underlying Claims. No other insurer contends that this exclusion applies. In evaluating prior knowledge exclusions, New York courts employ a two-pronged test, "first consider[ing] the subjective knowledge of the insured and then the objective understanding of a reasonable [person] with that knowledge." *Liberty Ins. Underwriters, Inc.* v. *Corpina Piergrossi Overzat & Klar LLP*, 913 N.Y.S.2d 31, 33 (N.Y. App. Div. 2010); *see also J.P. Morgan Sec. Inc.* v. *Vigilant Ins. Co.*, 51

---

[28] RLI argues that the *contra proferentem* doctrine (construing an ambiguity against the insurer) does not apply here because the parties are of equal bargaining power and Cushman was involved in negotiating the policy and the inclusion of exclusions. There is no evidence that Cushman was involved in negotiations related to Endorsement 5. The evidence RLI presents is inapposite; it relates to an exclusion in the 2012–2013 policy year surrounding the exclusion of TNV appraisals.

N.Y.S.3d 369, 382 (N.Y. Sup. Ct. 2017). The burden is on the insurer to show the applicability

of the known-claims exclusion. *Id.* More specifically, Illinois National must show (1) that

Cushman subjectively knew that a Wrongful Act occurred prior to the policy's effective date,

and (2) that a reasonable person with knowledge of the relevant facts might expect those facts to

be the basis of a claim. Illinois National has not met its burden.

As a threshold issue, the parties disagree about whose knowledge is at issue. The

Nottingham Policies state that they do not apply "[t]o any Claim arising from any Wrongful Act

committed prior to the beginning of the Policy Period, if on or before the inception date of this

Policy *any Insured knew* of such Claim[29] or the occurrence of a Wrongful Act that could

reasonably be expected to result in such Claim." (Cushman Stmt. ¶ 30; Dkt. 225, Pl. Exs. 1, 6 at

Excl. 8; Pl. Exs. 8A–B, 10 at Excl. 7.) (emphasis added). Illinois National looks solely to the

language of the exclusion and contends that the knowledge of "any Insured" governs. Cushman,

on the other hand, points to the definition of "Claim"—"knowledge of a Claim or of a Wrongful

Act that could reasonably be expected to result in a Claim shall mean knowledge by the General

Counsel or Risk Manager of the Named Insured"—and reads the exclusion language to include

only the knowledge of Cushman's General Counsel or Risk Manager. (*See* Cushman Stmt. ¶ 12;

Dkt. 225, Pl. Exs. 1, 6, 8A–B, 10 at Defin. 1.) The plain language of the Prior Knowledge

Exclusion makes clear that the knowledge of any Insured—defined as "any former, current, or

future partner, shareholder, officer, director or employee of the Insured, while acting on behalf of

---

[29] Cushman and Illinois National present differing interpretations of which claims are at issue
under the Prior Knowledge Exclusion. Cushman contends that the exclusion can be triggered only by
prior knowledge of the specific Claim or underlying plaintiffs to which it relates. In other words, what
should be considered is whether Cushman knew the TNV appraisals were Wrongful Acts likely to result
in the Underlying Claims. Illinois National, in contrast, asserts that the exclusion bars coverage where
Cushman had knowledge of a Wrongful Act and the Wrongful Act could reasonably be expected to result
in a Claim. Given that Illinois National has not met its burden even under the broader view of the claims
applicable under the exception, the court need not reach this issue.

the Insured, in connection with the rendering of Professional Services"—is applicable.

Even applying the more expansive view of whose knowledge is at play, Illinois National has not shown that the Prior Knowledge Exclusion bars coverage for the Underlying Claims. Illinois National argues that Cushman appraisers knew as far back as 2006 that issuing TNV appraisals was inherently misleading and might result in claims of professional malpractice or misfeasance, but it submits no persuasive evidence to substantiate its assertion. It points to the fact that Cushman changed the name of the appraisal method from Total Net Value to Total Net Proceeds but ignores the October 6, 2006 internal memo from Brian Curry, the individual who ordered the name change, that this was apparently done to "standardize the term and definition for use in our reports," (Dkt. 209, Illinois National Ex. NN) and his testimony that replacing "value" with "proceeds" was a personal preference. (Dkt. 225, Pl. Ex. 78 at 166:10–17.) Appraiser Michael Miller added that he believed Curry changed the name because "the word 'value' did not accurately represent the new type of analysis." (Dkt. 209, Illinois National Ex. MM ¶ 15.) Illinois National also contends that Cushman appraisers began taking issue with conducting TNV appraisals as far back as 2006, pointing to an affidavit by Miller, which states,

> The appraisers who were introduced to the new valuation premise questioned the authenticity of this new "valuation premise." As is typical in a non-conforming assignment and typical of large institutional firms . . . executive compliance managers discussed with the appraisers the premise, compliance, and the ability for [Cushman] appraisers to perform these types of appraisals. . . . [N]otwithstanding that the appraisals did not report market values, the parties in the process [were] aware market value was not being reported and it was explicitly stated in the appraisals that the value conclusions did not reflect market value.

> Because the valuation amounts being put on these new appraisal reports were significantly higher than market value, concern as to liability and the compliance approval required under FIRREA and USPAP was obviously present.

(*Id.* ¶¶ 12, 18.) But this ignores Miller's testimony that after meeting with Credit Suisse about

such issues, he "walked away feeling comfortable that everything was being done properly and these projects could continue forward." (Dkt. 225, Pl. Ex. 76 at 127:10–12.) He also testified that Cushman was "bound by the Uniform Standards of Professional Appraisal Practice ["USPAP"], and we could not find anything under that state or federal regulation that we adhered to that violated those requirements on appraisal." (Dkt. 225, Pl. Ex. 73 at 116:4–12.)

True, appraisers may have had concerns, but this does not mean they knew issuing TNV appraisals was inherently misleading, nor that a reasonable person with knowledge of the facts surrounding these appraisals might expect such activity to be the basis of a claim. To the contrary, Miller's concerns were assuaged after speaking to Credit Suisse, and there was no indication that Cushman was violating any USPAP requirements. Indeed, "mere knowledge of 'some consequences' of an act is inconsequential, which, standing alone, would not provide a reasonable basis [for] the insured to believe that it had committed a wrongful act that foreseeably will result in a claim." *J.P. Morgan*, 51 N.Y.S.3d at 383; *see also Title Indus. Assur. Co.* v. *First Am. Title Ins. Co.*, 853 F.3d 876, 885–86 (7th Cir. 2017) ("[m]ere suspicion of questionable transactions does not trigger the prior knowledge provision"). Under these facts, the Prior Knowledge Exclusion does not bar coverage for the Underlying Claims.

As a fallback, Illinois National argues that at a minimum, the Prior Knowledge Exclusion should bar coverage for the Highland Demand and the *Blixseth* and *Rhodes* Actions because each of those actions followed the first-filed *Gibson* Action. Given that the *Gibson* Action alleges that not only property owners but also developers and others were damaged, Illinois National contends that Cushman could reasonably expect that developers and non-insider note holders would bring a claim against it, which they did in the later-filed actions. But as the court in *Gibson* explained when it dismissed the claims against Cushman, the appraiser did not owe a

duty to unrelated parties not mentioned in the appraisals.[30] Thus, it does not follow that Cushman would have expected lawsuits from third parties to which it owed no duty. The Prior Knowledge Exclusion is thus inapplicable.

## IV.    Related Claims

### A.    The Related Wrongful Act Provisions

Having disposed of the exclusion issues, the court must next determine whether certain Related Wrongful Act Provisions apply such that the Underlying Claims are treated as though they were made during the 2009–2010 policy year. Illinois National argues that because the Underlying Claims are related, only the 2009–2010 policy is triggered, while Cushman and the other defendants contend, often for differing reasons, that the Underlying Claims trigger the policies in the policy year in which the specific claim was made.

The Policies generally provide coverage for claims that are first made against the insured during the policy period and reported in writing to the insurer. The parties do not dispute that the four Underlying Claims fall within the definition of "Claim" provided in the Nottingham Policies and incorporated into the Illinois National Policies, nor that each Underlying Claim arose and was reported during separate, consecutive policy years. Instead, Illinois National argues that all Underlying Claims should be deemed related to the first-filed *Gibson* Action and treated as a single claim under the 2009–2010 Illinois National Policy pursuant to the Related Wrongful Act Provisions in the Nottingham and Illinois National Policies. The 2009–2010 Nottingham Policy Limits of Liability provide, in relevant part:

If additional Claims are subsequently made which arise our [*sic*] of the same

---

[30] More specifically, the court stated, "[p]laintiffs have not presented any authority or argument showing Defendants owned a duty to Plaintiffs to use reasonable care in conducting the appraisals. For these reasons, the court finds neither FIRREA nor USPAP imposed a duty of care on Defendants in favor of Plaintiffs." (Dkt. 225, Pl. Ex. 15 at *39.)

Wrongful Act as Claims already made and reported to the Company, all such Claims, whenever made, shall be considered first made when the earliest Claim arising out of such Wrongful Act was first made and all such Claims shall be subject to one such Limit of Liability.[31]

For purposes of the Limits of Liability, a series of continuous, repeated or *interrelated Wrongful Acts shall be considered as one Wrongful Act.*

(Dkt. 225; Pl. Ex. 1) (emphasis added). The 2009–2010 Illinois National Policy similarly

provides:

[A]ny Claim that is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim or circumstances of which such notice has been given,[32] or *alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim or circumstances of which such notice has been given*, shall be considered made at the time such Claim or circumstances has been given to the Insurer.

(Dkt. 225, Pl. Ex. 2) (emphasis added).

## B.    Ambiguity of the Provisions

As a preliminary matter, Cushman contends that the terms "related" and "interrelated"

are ambiguous where, as here, they are undefined. "That the Policy does not have a specific

---

[31] ACE contends that the relevant inquiry "is whether the *Highland*, *Blixseth*, or *Rhodes* Claims arise out of the *same* Wrongful Act as *Gibson*," because "the 2009 Nottingham Policy permits relation only where the Wrongful Act is the *same*." (Dkt. 213 at 10, 11–13.) This is so, ACE argues, because the later "interrelated Wrongful Acts" language in the 2009 Nottingham Policy "protects the aggregate limits of the policy by establishing a rule for batching together related Wrongful Acts" and thus "the policy creates a higher hurdle for deeming a claim made during the policy period than it does for batching together Wrongful Acts for purpose of the aggregate limits." (Dkt. 328 at 10–11.) This interpretation is belied by the plain language of the policy. The "interrelated Wrongful Acts" language begins with the phrase "For purposes of Limits of Liability," which implies that the language following that phrase applies to the entire "Limits of Liability" section of the policy, not, as ACE contends, that "there is no basis to read the later provision into the earlier provision." Given the "interrelated Wrongful Acts" language, ACE's arguments related to the Illinois National Policy providing broader coverage than the Nottingham Policy also fail.

[32] Although Liberty analyzes both the "facts alleged" clause and the "wrongful act alleged" clauses of the Illinois National Policy, the court need not reach the "facts alleged" clause to resolve the related claims issue and thus focuses its analysis only on the "wrongful act alleged" clause in the 2009–2010 Illinois National Policy.

definition of the phrase 'related wrongful acts' does not itself render that phrase ambiguous. Rather, the Court asks whether the words are, in the context of the Policy, open to differing but reasonable interpretations."[33] *Dormitory Auth. of New York* v. *Cont'l Cas. Co.*, No. 12 civ. 281, 2013 WL 840633, at *7 (S.D.N.Y. Mar. 5, 2013), *aff'd in part, vacated in part*, 756 F.3d 166 (2d Cir. 2014). Here, Cushman's bald assertion that the terms "related" and "interrelated" are ambiguous simply because they are undefined fails. The parties have not presented differing but reasonable interpretations of these words, and "[n]othing in the [policies] or the record of this case suggests that the phrase 'related to' has been or should be given special meaning." *Id.* at *8. Thus, the court finds the language at issue unambiguous.

### C.     Effectiveness of 2009-2010 Illinois National Policy

Liberty also raises a threshold issue—whether the Related Wrongful Act Provision in the 2009–2010 Illinois National policy was effective when the Highland, *Blixseth*, and *Rhodes* Claims were made.[34] Liberty contends that because the 2010–2011 Illinois National Policy states that it is a "replacement" of the 2009–2010 policy, while the 2012–2013 Illinois National Policy states that it is a "renewal" of the 2011–2012 Illinois National Policy, the 2009–2010 policy, including its Related Wrongful Act Provision, had been "replaced" and was therefore ineffective at the time the Highland, *Blixseth*, and *Rhodes* Claims were made. Both Liberty and Illinois National agree that the ordinary meaning of "replacement" is "a . . . thing that replaces . . . something else," and that the definition of "replace" is to "serve as a substitute for or successor

---

[33] Courts interpreting similar provisions do not seem to agree whether "related" and "interrelated" are unambiguous. *See Dormitory Auth. of New York*, 2013 WL 840633, at *7 (collecting cases and noting that some find the relevant terms ambiguous while others determine such terms are unambiguous).

[34] Liberty also contends that the court should find that the Highland Demand, the *Blixseth* Action, and the *Rhodes* Action are covered under two separate policy years (i.e. the 2009–2010 policy as well as the policy year in which each Claim was made and reported). Liberty provides no support for this contention and the court finds no support in the record otherwise.

of." (Dkt. 204 at 14; dkt. 268 at 26, citing Merriam-Webster Dictionary). Even if the 2009–2010 policy was "replaced," it does not follow that the Related Wrongful Act Provision of that policy is nullified or rendered ineffective. Indeed, that provision specifically contemplates that claims made and reported after the policy year at issue may be implicated. Further, as Liberty pointed out in *Liberty Mut. Ins. Co.* v. *Treesdale, Inc.*, 418 F.3d 330, 343 (3d Cir. 2005), "in common sense parlance, 'renewal' and 'replacement' mean essentially the same thing . . . Black's Law Dictionary . . . defines 'renew' as including 'to replace.'"[35]

### D. Relatedness of the Claims

Courts interpreting policies with similar provisions have explained that "[t]o establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a 'sufficient factual nexus.'"[36] *Quanta Lines Ins. Co.* v. *Investors Capital Corp.*, No. 06 Civ. 4624, 2009 WL 4884096, at *14 (S.D.N.Y. Dec. 17, 2009); *accord Nomura Holding America, Inc.* v. *Federal Ins. Co.*, 45 F. Supp. 3d 354, 370–71 (S.D.N.Y. 2014). "A sufficient factual nexus exists where the Claims 'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus' among the Claims." *Quanta Lines*, 2009 WL 4884096, at *14 (quoting *Seneca Ins. Co.* v. *Kempter Ins. Co.*,

---

[35] Although Illinois National's arguments related to extrinsic evidence are similarly persuasive (*see* dkt. 268 at 26–27), the court need not reach these arguments given the unambiguous nature of the terms at issue.

[36] Cushman and Liberty argue that reliance on the factual nexus test is "misplaced" given that some courts applying the test dealt with specific definitions of "Related Claims" found in the policies at issue or different policy language altogether. (Dkt. 278 at 41; Dkt. 310 at 14.) True, the factual nexus test has been applied to varying types of policy language, some of which is similar to that in the present case. Thus, the factual nexus test is appropriate given the relevant policy language at issue. Further, use of the factual nexus test is also supported by the distinction drawn by the Second Circuit in *Nomura Holding Am., Inc.* v. *Fed. Ins. Co.*, 629 F. App'x 38 (2d Cir. 2015). There, the court explained that the factual nexus test need not be applied where "Related Claims" was defined in the policy at issue. It follows that the test is presumably most applicable where, as here, such a phrase is not defined.

No. 02 Civ. 10088, 2004 WL 1445830, at *8–9 (S.D.N.Y. May 21, 2004)). To demonstrate a

sufficient factual nexus, the claims need not "involve precisely the same parties, legal theories,

Wrongful Acts, or requests for relief." *Zunenshine* v. *Exec. Risk Indem. Inc.*, No. 97 Civ. 5525,

1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998).

Courts have found a sufficient factual nexus after conducting a side-by-side review of the

factual allegations in the relevant complaints where the claims at issue had specific overlapping

facts.[37] *See, e.g.*, *Nomura*, 45 F. Supp. 3d at 370–71 (S.D.N.Y. 2014) (finding "the relevant

complaints contain overlapping (and frequently identical) factual allegations, arising from

strikingly similar circumstances, alleging similar claims for relief" where plaintiffs in all actions

alleged they relied on certain misstatements in offering documents and registration statements

filed in connection with various RMBS offerings between 2005 and 2007); *Quanta Lines*, 2009

WL 4884096, at *14–15 (concluding that sufficient factual nexus existed between claims

accusing directors of failure to supervise the same representative's sale of the same unregistered

securities); *Zahler* v. *Twin City Fire Ins. Co.*, No. 04 Civ. 10299, 2006 WL 846352, at *6

(S.D.N.Y. Mar. 31, 2009) ("[a] side-by-side review of the Securities Complaint and ERISA

Complaint reveals that the facts alleged in the two actions are in many cases identical");

*Seneca*, 2004 WL 1145830, at *9 (finding a factual nexus where the claims shared "numerous

logically connected facts and circumstances"); *Zunenshine*, 1998 WL 483475, at *5 (finding a

"strong factual nexus" where both lawsuits alleged "four of the same six plaintiffs made virtually

---

[37] The parties on both sides cite numerous cases in support of their positions as to whether the
Underlying Claims are in fact related. The court notes that there appears to be some inconsistency in the
case law surrounding "related claims." *See* John Zulkey, *Related Acts Provisions: Patterns Amidst the
Chaos*, 50 VAL. U. L. REV. 633, 636 (2016) (surveying "related claims" cases and noting that "an
imaginative attorney can scour up any number of factors that unite or divide the claims at issue, but the
challenge is finding binding or persuasive decisions stating that those factors are decisive"). For this
reason, the court has surveyed the relevant New York cases and analogized the facts of those cases to the
present case to help guide its determination on this issue.

identical false statements in reports, press releases, and other public statements" during the same time period).

Similarly, the Underlying Claims at issue contain overlapping factual allegations and arise from strikingly similar circumstances. They involve the same alleged course of conduct, during the same time period, and involve many of the same MPCs. Specifically, plaintiffs in the Underlying Claims each allege they were harmed in connection with appraisals done using the Total Net Value methodology, which were misleading and artificially inflated the value of high-end properties, to the benefit of Credit Suisse and Cushman. This is much more than a "tenuous factual overlap." *See Glascoff* v. *OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013, 2014 WL 1876984, at *6 (S.D.N.Y. May 8, 2014) (finding no factual nexus because "the factual overlap between the two Claims [was] tenuous at best" where first complaint alleged board members failed in their control and oversight of CEO and second complaint alleged board failed to investigate allegations of CEO's misconduct).[38] Contrary to various arguments by Cushman, ACE and Liberty, the claims need not involve "precisely the same parties, legal theories, Wrongful Acts, or requests for relief."[39] *Zunenshine*, 1998 WL 483475, at *5. Indeed, although

---

[38] The factual nexus in the present case is much stronger than the other cases on which Cushman relies. *See Home Ins. Co. of Ill. (New Hampshire)* v. *Spectrum Info. Techs., Inc.*, 930 F. Supp. 825, 848 (E.D.N.Y. 1996) (concluding that wrongful acts were not "the same as, interrelated to, a continuation of, or repetitious of" those in the original claim because the first wrongful act reported—misstatements regarding a licensing agreement—represented a distinct act of wrongdoing from other wrongs alleged—misstatements regarding earnings, trading based on material nonpublic information, and failure to disclose a related SEC inquiry); *Nat'l Union Fire Ins. Co. of Pittsburgh* v. *Ambassador Grp., Inc.*, 691 F. Supp. 618, 623–24 (E.D.N.Y. 1988) (concluding four claims against insured directors did not arise out of the "same or interrelated acts" because they were "legally distinct claims that alleged different wrongs to different people" where one alleged violations for failing to disclose information, another alleged negligent mismanagement and breach of fiduciary duties through misstatements in annual statements, another alleged inducement based on reliance on false financial statements, and the last alleged mismanagement of a subsidiary company).

[39] Cushman and ACE contend that while the *Gibson* Action complained about the TNV *method*, the Highland Demand alleged that Cushman plugged *bad data* into the TNV method and thus the

34

differently situated, plaintiffs in the Underlying Claims appear to be various players affected by the alleged scheme—property owners in MPCs, an owner and manager of an MPC, an MPC developer, and a hedge fund that owned MPC debt. Plaintiffs in the original *Gibson* Action recognized these players, alleging that not only property owners but developers and others were affected by the alleged scheme.

That many of the same properties and appraisals were at issue in the Underlying Claims further demonstrates the factual nexus. The *Gibson* Action was brought on behalf of persons and entities that purchased property and homes in four MPCs—Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn Sur Mer; the *Blixseth* Action was brought by the owner and manager of Yellowstone Club;[40] the Highland Demand involved plaintiffs whose claims arose out of loans involving, among others, Yellowstone Club, Ginn Clubs & Resorts, and Rhodes Ranch; and the *Rhodes* Action was brought by certain borrowers, including Rhodes Ranch. Indeed, plaintiffs in the *Gibson* Action specifically pointed out that the alleged scheme began at Lake Las Vegas and was repeated at various properties around the country:

> Having perfected the appraisal and lending scheme on Lake Las Vegas, the co-conspirators, Credit Suisse and Cushman embarked on a plan to employ these same tactics . . . at each MPC thereafter at Tamarack, Yellowstone Club, Ginn sur

---

Highland Demand is not related to the *Gibson* Action. (Dkt. 221 at 40; Dkt. 210 at 14.) To the contrary, Highland's mediation statement specifically states that Cushman's "appraisers knew that the Total Net Value methodology did not reflect accepted industry standards or definitions," and that "[i]n addition to using the aberrant methodology, [Cushman] also adopted unsupported and unreasonable assumptions and projections in its appraisal." (Dkt. 225, Pl. Ex. 21 at 4–5.) Contrary to Cushman's contention that the Highland Demand involved different wrongs, the mediation statement also makes clear that Highland's claims "arise[] out of a series of appraisals C&W issued that purported to value five high-end residential and resort developments," that certain funds managed by Highland "rel[ied] upon C&W's appraisals" when investing in the subject loans, and that "C&W's appraisals grossly overvalued the Developments and, as a result, the Subject Loans were severely under-collateralized." (*Id.* at 1–2.)

[40] The plaintiff in the *Blixseth* Action was also the sole shareholder of Blixseth Group, Inc., which owned all of the "A" voting shares of the Yellowstone Mountain Club, LLC, which owned the real estate that the allegedly fraudulent appraisal were purportedly based on. (Dkt. 225, Pl. Ex. 16 ¶ 24.)

Mer and others with the exact same predictable and foreseeable result: default and bankruptcies with the loss of contractual amenities, clubs and land values at eighty (80%) percent or more.

(Dkt. 225, Pl. Ex. 14 ¶ 53.) Cushman is right to point out that each appraisal was a different work product, providing a unique valuation analysis and conclusion by a different Cushman employee. Certain appraisals, however, were at issue in multiple cases (e.g. the appraisal for Yellowstone Club was implicated in the *Gibson* Action, the Highland Demand, and *Blixseth* Action) and the unique appraisals were produced using the same allegedly misleading TNV appraisal method. The claims are unmistakably based on much more than a "tenuous . . . factual overlap." *See Glascoff*, 2014 WL 187684, at *6.[41]

## IV.    Recoupment Counterclaims

Both Illinois National and ACE brought counterclaims for recoupment of certain defense costs and money spent in settling certain of the Underlying Claims. Since neither Endorsement 5 nor the Prior Knowledge Exclusion bars coverage, the counterclaims for recoupment must be denied. Given that the Underlying Claims are related, however, Illinois National is entitled to reimbursement of amounts[42] paid in excess of Illinois National's limit of $23 million for the 2009–2010 policy year. The Nottingham Policy provides, in relevant part:

If the Company has paid any amount in settlement or satisfaction of Claim or

---

[41] Cushman and Illinois National present differing views of their treatment of the claims as "related" during the 2009–2013 time period. Illinois National maintains that Cushman referred to the Highland Demand and the *Gibson* Action as related from the beginning but changed course when it realized that the potential exposure from the Underlying Claims might exceed the policy limits of one policy period. Cushman, on the other hand, argues that Illinois National initially took the position that TNV claims were not all related but has now changed course to argue that the Underlying Claims are related. As both sides have shifted positions, these arguments add little to the determination at hand.

[42] "Amounts" refers to that which is contained in Clause 8 of the 2009–2010 Nottingham Policy. At the time it filed its answer (dkt. 84), Illinois National asserted that it had expended in excess of $27 million under the 2009–2010 Illinois National Policy and has since stated that this amount continues to increase as it advances payments on the *Gibson* appeal.

judgments or Claims Expenses in excess of the Limits of Liability or within the amount of the Deductible, the Insured shall be liable to the Company for such amounts and, upon demand, shall promptly pay such amount to the Company.[43]

(Dkt. 225, Pl. Ex. 1 at Clause 8.) Further, because the Underlying Claims are related, ACE, Liberty and RLI must pay, to the extent the ACE, Liberty, and RLI 2009–2010 Policies are triggered, all amounts incurred in connection with each Underlying Claim that are in excess of the 2009–2010 Illinois National Policy (as to ACE) and the 2009–2010 ACE Policy (as to Liberty and RLI), up to their respective policies' limits.

## V.      Breach of Contract Claims

Counts VI and VII allege that Illinois National breached its obligations by failing and refusing to provide unqualified and timely coverage to Cushman for each of the Underlying Claims and certain Other Claims (as defined in the Complaint) under the Illinois National policy in effect at the time each such Claim was first made against Cushman. (Dkt. ¶¶ 111, 118.) Illinois National argues that count VI should be dismissed, while Cushman asks the court to enter judgment in its favor as to count VI. Illinois National contends that count VI should be dismissed because Cushman does not specify which provision, if any, Illinois National breached. True, the court previously dismissed count IX on this basis but determined that its own examination of the ACE Policy did not reveal violation of a specific provision. Here Cushman presents no additional evidence apart from the allegations in its complaint and that evaluated by the court in its analysis of the declaratory judgment claims above. This does not raise a triable issue of fact and Illinois National's motion for summary judgment as to count VI is thus granted and

---

[43] Cushman agrees that pursuant to Clause 8 of the Nottingham Policy, reimbursement "provides the right to recover sums paid in excess of policy limits for allowed claims." (Dkt. 346 at 28.)

Cushman's motion is denied.[44]

With respect to count VII, the parties have not briefed issues related to the Other Claims. Cushman has not moved for summary judgment on them, and Illinois National's motion does not substantively address the Other Claims. As the Other Claims raise issues not addressed by the motions before the court, Illinois National's motion for summary judgment is denied as to count VII.[45] *MPM Silicones, LLC* v. *Union Carbide Corp.*, No. 111-cv-1542, 2016 WL 3962630, at *35 (N.D.N.Y. July 7, 2016) (denying summary judgment because "[t]he Court need not decide issues that are not adequately briefed").

Counts VIII and X[46] allege that Illinois National and ACE breached their obligations under the Standstill Agreement, which all parties agree requires Illinois National and ACE to each pay 50% of the defense costs for the Underlying Claims. Cushman contends that Illinois National and/or ACE have failed to pay $155,047.60 of defense costs incurred by Perkins Coie, local counsel in certain of the Underlying Claims. Illinois National counters that it has paid its 50% with the exception of a May 31, 2017 invoice, 50% of which it intends to pay in ordinary course. Although Illinois National seems to have made a good faith effort to pay its 50% share,

---

[44] Illinois National argues in its memorandum of law that counts VI, VII, VIII, and XI should be dismissed but does not specifically seek dismissal of the claims in its motion. Given that Illinois National's motion is styled as a "Motion for Partial Summary Judgment," the court assumes Illinois National moves for summary judgment as to counts VI, VII, VIII, and XI.

[45] Cushman notes that *Berger* v. *Cushman & Wakefield of Pa, Inc.*, No. 2:13-cv-05195 (E.D. Pa. Sept. 5, 2013) is the only Other Claim pending, and that Illinois National does not argue that Endorsement 5 or the Prior Knowledge Exclusion apply, but instead contends that Exclusion 1 (barring coverage for fraud) applies.

[46] This court previously granted ACE's motion to strike "to the extent Cushman seeks attorney's fees in connection with count X." (Dkt. 109.)

there appear to be some discrepancies in the amounts paid and the amounts owed.[47]

ACE contends that Cushman has failed to meet its burden to show any consequential damages or, if Cushman seeks to recover only unpaid defense costs for ACE's breach of the Standstill Agreement, count X is duplicative of count III and must therefore be dismissed. Count X is not duplicative of count III as count III seeks declaratory relief in connection with the 2009–2010 ACE Policy while count X seeks damages for breach of the Standstill Agreement. It also appears that ACE has not made any payments on the relevant Standstill Agreement invoices. (*See* Dkt. 278-1 ¶ 12; Dkt. 278, Pl. Exs. 98–99.) Further, Illinois National and ACE apparently dispute the commencement date of ACE's agreement to pay 50% of Cushman's defense expenses pursuant to the Standstill Agreement. These are disputes of fact. Given the record before the court, a reasonable jury could find for Cushman, and thus summary judgment is denied as to counts VIII and X.

Finally, count XI alleges that Illinois National breached the implied covenant of good faith and fair dealing by, among other things, (a) asserting that the Underlying Claims fall within the 2009–2010 Illinois National Policy; (b) asserting inapplicable and insupportable defenses to coverage and threatening that it might not choose to renew coverage with Cushman in an effort to compel Cushman to acceded to the treatment of the Underlying Claims as related claims all falling under the 2009–2010 policy year; (c) demanding that Cushman agree to grant it a right of recoupment; (d) taking inconsistent positions with respect to the scope and meaning of various

---

[47] For example, the June 21, 2013 invoice is for $91,986.54. Illinois National's 50% share amounts to $45,993.27, but Illinois National paid $45,934.75, approximately $58.52 less than its share. Similarly, the April 3, 2014 invoice is for $77,225.96. Illinois National's 50% share amounts to $38,612.98, but Illinois National paid $38,554.00, approximately $58.98 less than its share. Although there may be a reasonable explanation for the discrepancies, the court has not been presented with any such evidence. Further, Illinois National submitted its reply brief on September 15, 2017, several months after the May 31, 2017 invoice was issued.

policy terms and exclusions, as well as which Illinois National Policies are trigged by each of the Underlying Claims; (e) unreasonably delaying payment and/or refusing payment for the Other Claims; and/or (f) demanding documents and/or information as a prerequisite to payments under the Standstill Agreements. (Dkt. 1 ¶ 141.) New York law recognizes that the implied covenant of good faith and fair dealing in an insurance contract encompasses the insurer's duty to investigate in good faith and pay covered claims. *Bi-Econ. Mkt., Inc.* v. *Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 131 (N.Y. 2008). Yet there remains a strong presumption "against a finding of bad faith liability by an insurer," and "[t]he presumption against bad faith liability can be rebutted only by evidence establishing that the insurer's refusal to defend was based on more than an arguable difference of opinion and exhibited a gross disregard for its policy obligations." *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 625 (2d Cir. 2001). The court finds no such evidence here. Many of the allegations are based on a mere difference of opinion. To the extent they are not, there is no evidence that Illinois National exhibited gross disregard for its policy obligations. To the contrary, even while coverage was in dispute, Illinois National has continued to pay defense costs and agreed to fund $10 million to settle the Highland claim. Thus, Illinois National's motion for summary judgment as to count XI is granted, to the extent this count relates to the Underlying Claims. This count survives as it relates to the Other Claims for the reasons stated above in relation to count VII.

## VI. Affirmative Defenses

Cushman also requests that the court dismiss any affirmative defenses filed by Illinois National and ACE that correspond to counts I, III, IV, V, and IV.[48] All such affirmative

---

[48] Cushman does not identify which affirmative defenses "correspond" to counts I, III, IV, V, and IV. Based on the courts review of all affirmative defenses, the court assumes that Illinois National's

defenses, except Illinois National's ninth defense and ACE's twelfth defense, as they relate to the Underlying Claims, will be dismissed for the reasons stated above. Illinois National (in its twelfth affirmative defense) and ACE (in its ninth affirmative defense) also assert that Cushman's claims are barred by the doctrine of contingent loss/fortuity. Illinois National is correct that it can assert the fortuity doctrine to disclaim coverage for the Underlying Claims in addition to its defense based on the Prior Knowledge Exclusion. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA.* v. *Stroh Cos., Inc.*, 265 F.3d 97, 107 (2d Cir. 2001) (noting that "the known loss defense is distinct from a defense based on policy language excluding coverage for injuries that were expected or intended by the insured"). Illinois National, however, simply reiterates the arguments it made with respect to its Prior Knowledge Exclusion defense in support of its fortuity defense. ACE makes no argument on this point. The "known loss" defense, "requires consideration of whether, at the time the insured bought the policy . . . the loss was known." *Stonewall Ins. Co.* v. *Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995). The known loss doctrine does not apply "where an insured merely knows there is a risk of loss, as knowledge of a risk is the very purpose of acquiring insurance." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* v. *Xerox Corp.*, 792 N.Y.S.2d 772, 785 (N.Y. Sup. Ct. 2004). As discussed in detail above, at the time the policy was issued, there is no evidence that Cushman knew of anything more than a risk of loss. Accordingly, Illinois National's twelfth affirmative defense and ACE's ninth affirmative defense are dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, Cushman's motion for partial summary judgment (dkt. 221) is granted in part and denied in part, Illinois National's motion for partial summary judgment (dkt.

corresponding affirmative defenses include the sixth, seventh, and ninth defenses, and ACE's corresponding affirmative defenses include the fourth, fifth, sixth, and twelfth defenses.

207) is granted in part and denied in part, ACE's motion for summary judgment (dkt. 210) is denied, Liberty's motion for summary judgment (dkt. 203) is denied, and RLI's motion for summary judgment (dkt. 220) is denied.

With respect to the declaratory judgment claims, counts I, III, IV, and V, neither Endorsement 5 nor the Prior Knowledge Exclusion bars coverage for the Underlying Claims; the *Blixseth* Action, Highland Demand, and *Rhodes* Action are related to the *Gibson* Action; Illinois National is entitled to reimbursement of amounts paid in excess of Illinois National's limit of $23 million for the 2009–2010 policy year; and ACE, Liberty and RLI must pay, to the extent the ACE, Liberty, and RLI 2009–2010 Policies are triggered, all amounts incurred in connection with each Underlying Claim that are in excess of the 2009–2010 Illinois National Policy (as to ACE) and the 2009–2010 ACE Policy (as to Liberty and RLI), up to their respective Policies' limits.

With respect to the breach of contract claims, Illinois National's motion for summary judgment is granted as to count VI as well as count XI to the extent this count relates to the Underlying Claims, and denied as to counts VII and VIII, as well as count XI to the extent this count relates to the Other Claims. Cushman's motion for summary judgment is denied as to count VI. ACE's motion for summary judgment is denied as to count X. Counts IX and XII were previously dismissed. (*See* dkt. 109.)

Further, Illinois National and ACE's motions for summary judgment on their respective counterclaims for recoupment are denied and Cushman's motion on these counterclaims is granted. [49] Cushman and Illinois National's motions for summary judgment on Illinois National's

---

[49] To the extent such counterclaims refer to reimbursement, the court refers the parties to the portion of its order related to the declaratory judgment counts.

declaratory judgment counterclaims are granted in part and denied in part as is consistent with the reasoning in this opinion. Certain affirmative defenses asserted by Illinois National and ACE as identified in this opinion (except Illinois National's ninth defense and ACE's twelfth defense) are also dismissed, to the extent they relate to the Underlying Claims.[50] Remaining counts include count II, count VII, count VIII, count X and count XI to the extent it relates to the Other Claims.

The case will be called for status hearing on May 22 at 11:00 a.m. to set a date for trial. Before the status hearing, the parties are directed to discuss the possibility of settlement.

Date: April 20, 2018

_____
U.S. District Judge Joan H. Lefkow

---

[50] Illinois National has apparently agreed "to stipulate to the dismissal without prejudice (subject to reinstatement pending the decision of the *Gibson* appeal) of [Illinois National's] Eighth Affirmative Defense raising Exclusion #1 of the Nottingham Policies, which provides that 'This Policy does not apply: to any claim alleging intentional wrongdoing, fraud, dishonesty, or criminal or malicious acts of the Insured' as well [as] that portion of [Illinois National's] counterclaim raising Exclusion 1 only." (Dkt. 225, Pl. Ex. 71.)